STATE ex Rel. SNIDOW et al., Plaintiffs, *v.* STATE BOARD OF EQUALIZATION et al., Defendants.

(No. 6,983.)

(Submitted April 21, 1932. Decided July 7, 1932. Motion for Rehearing Submitted November 21, 1932. Opinion Filed December 13, 1932.)

[17 Pac. (2d) 68.]

*Mr. W. T. Pigott, Mr. I. Parker Veazey, Jr.,* and *Messrs. Brown, Wiggenhorn & Davis,* for Relators, submitted an original and a reply brief; *Mr. Veazey* and *Mr. Rockwood Brown* argued the cause orally.

*Mr. John J. Greene,* appearing in behalf of Respondent State Board of Equalization and as a member thereof, submitted a brief and argued the cause orally.

*Mr. D. M. Kelly, Mr. John V. Dwyer, Mr. John A. Groeneveld* and *Mr. D. G. Stivers,* for Respondent Anaconda Copper Mining Company, submitted a brief; *Mr. Kelly* argued the cause orally.

*Messrs. Gunn, Rasch, Hall & Gunn,* appearing as *Amici Curiae,* in behalf of the St. Joseph Lead Company, submitted a brief; *Mr. Milton C. Gunn* argued the cause orally.

*Messrs. Gibson & Smith,* for the Jardine Mining Company; *Messrs. Kremer, Sanders & Kremer,* for the Butte & Superior Mining Company, the trustees for the now dissolved East Butte Copper Mining Company and Pittsmont Copper Company, the Trout Mining Company and other companies and individuals engaged in mining; *Mr. Henry C. Smith,* for certain owners of mines and mining claims in Broadwater

and Lewis & Clark Counties; *Mr. Charles R. Leonard* and *Mr. J. A. Poore,* for the North Butte Mining Company, the Philipsburg Mining Company and the American Gem Mining Syndicate; *Mr. Timothy Nolan,* for the Silver Prince Mining Company; *Messrs. Murphy & Whitlock* and *Mr. John E. Corette,* for the Montana Premier Gold Mining Company, the Thompson Falls Mining Company and twenty-one other mining companies and individuals; *Mr. Howard A. Johnson,* for the I. B. Mining Company, the Basin Tunnel Mining Company, and Roy E. Miller, Inc.; *Messrs. Logan & Child, Messrs. Foot, Aronson & Foot,* and *Mr. G. H. Grubb,* for the Ole Mining Company, the Iron Mask Lead Mining Company, and thirteen other companies; *Messrs. Cooper, Stephenson & Hoover,* for the Silver Dyke Mining Company, the Neihart M. & M. Company and certain individuals; and *Mr. George E. Hurd,* for George T. McGee, appearing as *Amici Curiae,* submitted a brief; *Mr. Henry C. Smith* and *Mr. Fred L. Gibson,* argued the cause orally.

*Messrs. Duncan & Duncan,* for the Liberty Montana Mines Company, the Boaz Gold Mining Company and six other mining companies as well as certain individuals engaged in mining; *Mr. R. E. McHugh,* for the Copper Mask Mining Company and six other mining companies; *Mr. Justin M. Smith,* for Nelson Story, Jr.; *Messrs. Molumby, Busha & Greenan,* for the Great Falls Mill & Smeltermen's Union No. 16, the Anaconda Mill & Smeltermen's Union .No. 117, the Anaconda Metal Trades Central Council of Anaconda, and Federation of Shop Crafts of Deer Lodge, appeared as *Amici Curiae.*

## Opinion: PER CURIAM.

The opinion in this case was handed down last July. In due time motions for rehearing were filed by the relators and the respondent Anaconda Copper Mining Company. We have given the entire subject, as presented by the pleadings, further intensive study, and have concluded, in the interest of accuracy and clarity, to revise the opinion.

This is an original proceeding in mandamus. Upon the filing of the verified petition of the relators, an alternative writ was issued and served. The respondents State Board of Equalization, and James H. Stewart, D. J. Muri and John J. Greene, individually and as members of the State Board of Equalization, appeared by answer. The respondent Anaconda Copper Mining Company, a corporation, appeared by separate answer. The St. Joseph Lead Company, a corporation, was permitted to file a petition in intervention. In addition, counsel for certain independent mining operators, vitally interested in the questions presented for decision, were permitted to appear in the case as *amici curiae*. The relators filed a motion for judgment on the pleadings, and the cause was argued and submitted to this court for decision upon questions of law; it being agreed by counsel for relators and respondents that it should be deemed that no disputed issues of fact are involved.

The case as presented for our determination turns upon these three questions:

1. Under the provisions of Initiative Measure No. 28 is the gross value of metals, in imposition of the tax, to be determined by taking the pounds and ounces of metals produced and multiplying the same by the New York prices of metals for the preceding calendar year, without allowance of differentials or deductions for any reason?

2. Is arsenic or arsenious oxide taxable under the law?

3. Resulting from the answer to these questions, was the board, in making the assessments, following a fundamentally wrong principle of assessment?

By Initiative Measure No. 28, passed by the people at the general election in November, 1924 (Laws 1925, pp. 489–497), a license tax is imposed on every metal mine operator in Montana for the privilege of engaging in business as prescribed by the Act. In the administration of this law the state board of equalization, in the year 1925, and subsequent years, fixed the amount of the tax to be charged and collected on metals at the average annual New York market price as shown

by the Engineering and Mining Journal (Engineering and Mining Journal-Press) of New York City, less differentials allowed to be deducted from New York market price quotations in determining the Montana price for metals other than gold, and did not exact any tax on account of the production of arsenic.

The answer of the respondent board alleges that in the first report made by the Anaconda Copper Mining Company, filed in 1925, reporting operations for the year 1924, it returned that there had been produced from its ores over ten million pounds of arsenic, refined and crude, but the board, after first assessing the same, later on its own motion refused to accept the return as to arsenic, refined and crude, and refused to compute any tax whatsoever upon the value of the same. In the succeeding years, 1925 to 1930, the Anaconda Copper Mining Company, as shown by its net proceeds reports, has produced from its ores mined in Montana nearly eighty million pounds of arsenious oxide (white arsenic), but it has omitted to make any return of the same under the ruling of the state board of equalization.

The average annual New York prices of the various metals specified for the years 1924 to 1930, inclusive, are made to appear. For instance, in 1924 the average New York price for silver was 66.781 cents per ounce, for copper 13.024 cents per pound, for lead 8.097 per pound, and for zinc 6.694 cents per pound.

It is the relators' contention that in the years 1925, 1926, 1927, 1928, 1929 and 1930, the respondent board misinterpreted and misapplied the law in allowing deductions by way of differentials between the New York quotations and the value of such metals in Montana; in other words, the relators contend that the tax should have been determined by multiplying the New York price of the metals by the number of pounds or ounces of metals produced. Deductions allowed by the board of the differences in value of the metals in Montana and New York amounted to 3 cents an ounce from the average New York quoted silver price; 2½ cents a pound from the

average quoted copper price; 1½ cents a pound from the average quoted lead price; and one cent a pound from the average quoted zinc price. The relators contend that such deductions are illegal and amount to a rebate, and that by reason thereof tax payments under the law since the year 1925 have been evaded to the extent of about a half million dollars.

A peremptory writ is sought to compel the state board of equalization to review the reports filed by the metal mines operators in the state of Montana during the years 1925 to 1931, both inclusive, covering the operating years 1924 to 1930, and to assess for those years, and hereafter, the gross value of the metal product of all Montana mines as to each operator, respectively, as regards silver, copper, lead, zinc and arsenic, and other metals and mineral products which may not have been assessed or which were not heretofore assessed at the average annual New York City value thereof, and to determine the gross value of all merchantable metals and mineral products extracted or recovered as shown by gross smelter returns of such metals or mineral products in dollars and cents, without any deductions, based upon the average quotations of the price of such metals or mineral products in the city of New York, as evidenced by the Engineering and Mining Journal of New York City during the calendar year preceding the year when such reports were filed.

In 1924, J. W. Walker, O. A. Bergeson, and A. J. Violette constituted the membership of the state board of equalization, and Initiative Measure No. 28 was in its entirety prepared by them and its passage given their active advocacy and support before the people. In 1925, when the Act was first construed, interpreted and applied by the board, the board consisted of the same J. W. Walker and O. A. Bergeson and James H. Stewart; and after public hearings the board determined that the "gross product" of the metals taxable under the Act is the market value thereof in Montana, and in order to fix such value, and to give effect to all the provisions of the Act, it could not, and the law does not authorize it to, multiply the

number of pounds of metal produced by the average quotations of the price thereof in the city of New York as shown by the Engineering and Mining Journal, but that the proper and correct construction of the Act requires that it find the gross value of the product in Montana by allowing proper differentials from the New York City quotations which shall represent a fair, equitable and nondiscriminatory deduction applicable to all persons subject to the Act.

In 1925, the Silver Dyke Mining Company reported the metals produced by it, basing the gross value thereof in pounds and ounces upon the actual amount received for metals produced for the purpose of fixing the tax, but the board rejected such basis of computation, which amounted to more than the price established by the board. The board then ruled that the prices of metals fixed by it "were used in computing the tax of each and every mine operator in the state, and were determined in accordance with the requirements of section 3 of Initiative Measure No. 28, which provides that the prices shall be 'based upon' the average quotations * * * in the city of New York * * * during the calendar year immediately preceding. This board does not feel that the New York prices should be used in determining the value of metals in Montana, but rather should be used as a base for determining Montana values, and have therefore allowed a differential between the average New York prices and the Montana prices."

Thus from the very beginning in the administration of the law to date such deductions have been permitted by the board as just and proper under the language employed in the statute. The board's interpretation of the Act permitting such deductions has been consistent at all times, although its membership has been changed in personnel, and it has clearly reported such interpretation and application of the law by it in its annual reports to the Governor and the legislative assemblies convened in the years 1927, 1929 and 1931, as required by law (Laws 1923, p. 11), without question being raised as to the correctness thereof, until the institution of this pro-

ceeding. However, it is made to appear that in a publication called the "Copper Target," prepared and circulated by the Anaconda Copper Mining Company in opposition to the enactment of the law by the people at the general election held in the year 1924, it is stated, *inter alia,* by way of argument against the enactment of the law, that: "As construed by the proponents of the law who have discussed it publicly, this tax is not a tax upon gross proceeds or gross value of any Montana product. Under their construction, the gross value of the product is determined by taking the gross yields in metals at the smelter, and applying to this yield the quoted price, per pound, ounce, or other unit of such metals, paid in New York. * * * In the case of a company refining its product in Montana, no consideration is given to its cost of transportation to the eastern market, selling commission and delivery to the consumer."

The statute must be read and considered in its entirety, and no word is to be considered meaningless if a construction can be found which will give it effect. (*State ex rel. Anaconda C. Min. Co.* v. *District Court,* 26 Mont. 396, 68 Pac. 570, 69 Pac. 103; *Stadler* v. *City of Helena,* 46 Mont. 128, 127 Pac. 454; *State ex rel. Smith* v. *Duncan,* 55 Mont. 376, 177 Pac. 248; *In re Crow Creek Irr. District,* 63 Mont. 293, 207 Pac. 121; *Mid-Northern Oil Co.* v. *Walker,* 65 Mont. 414, 211 Pac. 353; *In re McLure's Estate,* 68 Mont. 556, 220 Pac. 527; *City of Billings* v. *Public Service Com.,* 67 Mont. 29, 214 Pac. 608; *Dosen* v. *East Butte Copper Min. Co.,* 78 Mont. 579, 254 Pac. 880; *State ex rel. Special Road District* v. *Millis,* 81 Mont. 86, 261 Pac. 885.) The legislative intent in the enactment of a statute may not be gained from the wording of any particular section thereof, but only from a consideration of the Act as a whole, since it was passed as an entirety, and its division into sections is merely a matter of convenient reference. (*In re Crow Creek Irr. District,* supra.) In construing a statute the court must endeavor to give meaning to every word, phrase, sentence and section, if it is possible to do so, and will never declare any part of it inoperative if it is reasonably

possible to reach any other conclusion. (*Dosen* v. *East Butte Copper Min. Co.*, supra.) "The words, phrases and sentences of a statute are to be understood as used, not in any abstract sense, but with due regard to the context, and in that sense which best harmonizes with all other parts of the statute. In expounding one part of a statute, therefore, resort should be had to every other part. * * * And where one part of the statute is susceptible of two constructions, and the language of another part is clear and definite and is consistent with one of such constructions, and opposed to the other, that construction must be adopted which will render all clauses harmonious." (*State ex rel. Bitter Root Valley Irr. Co.* v. *District Court*, 51 Mont. 305, 152 Pac. 745, 746.)

In considering the constitutionality of a statute, courts must indulge every presumption in favor of its validity, the question being, not whether it is possible to condemn, but whether it is possible to uphold the Act; and a statute will not be declared invalid unless its unconstitutionality appears beyond a reasonable doubt. And where two constructions are possible, one of which will result in upholding its constitutionality and the other in declaring it invalid, the former will be adopted. (*State ex rel. Public Service Com.* v. *Brannon*, 86 Mont. 200, 67 A. L. R. 1020, 283 Pac. 202.) The purpose of construction is to ascertain the legislative intention, and it must be presumed that it was not the intention of the lawmakers to violate either state or federal constitutional provisions. (*State* v. *Rocky Mt. Bell Tel. Co.*, 27 Mont. 394, 71 Pac. 311.)

With the foregoing fundamental principles of statutory construction in mind, we now proceed to an interpretation of the law.

The title of the Act clearly indicates its object to provide a license for revenue purposes on all who engage in carrying on the business of mining as a result of which "Gold, Silver, Copper, Lead, or Any Other Metal or Metals or Precious or Semi-Precious Gems or Stones of Any Kind Shall Be Mined, Extracted or Produced, to Pay to the State Treasurer an An-

nual License Tax for Engaging in and Carrying on Such Business in This State; Fixing the Amount of Such License Tax, Providing a Method for the Assessment and Collection Thereof and the Disposition of the Proceeds of Such License Tax,'' etc.

Section 1 defines the term ''person,'' as used in the Act.

Section 2 imposes a license tax each year for engaging in and carrying on the ''business of working or operating any mine or mining property in the state of Montana, from which gold, silver, copper, lead or any other metal or metals, or precious or semi-precious stones of any kind shall be mined, extracted or produced.''

Section 3 provides: ''The total 'Gross Value of Product' as used in this Act, shall mean the market value of all merchantable metals, precious and semi-precious gems and stones extracted or produced, each year from any mine or mining property in the State of Montana or recovered from the smelting, milling, reduction, or treatment in any manner of ores extracted from any such mine or mining property or from tailings resulting from the smelting, reduction or treatment of any such ores. That whenever the ores require smelting, reduction, or treatment to ascertain the metal contents of such ores, the gross value of the product thereof shall be determined by taking the market value of all merchantable metals or mineral products extracted or recovered thereby, as shown by the gross smelter returns of such metals or mineral product in dollars and cents, without any deductions for costs of smelting, reduction or treatment, or otherwise, based upon the average quotations of the price of such metals, or mineral products, in the City of New York, as evidenced by some established authority or market report, such as the Engineering and Mining Journal of New York City, or other standard publications, giving the market reports during the calendar year immediately preceding. Should there be no quotation covering any particular product, then the State Board of Equalization shall fix the value of such gross product, or such portion thereof, in such a manner as may seem equitable.''

Section 4 provides for a license tax of $1 annually, "together with an additional sum or amount equal to an amount computed on the gross value of product which may have been derived by such person from such business, work or operation within this State during the calendar year immediately preceding," at rates specified; certain exemptions being allowed.

Section 5 provides for the computation of the tax and the statement of the gross value of the product from all mines and mining property worked or operated by any person in the state during the calendar year immediately preceding, and, *inter alia* (subdivisions 5 and 6) : 5. "The gross yield of such ores, mineral products or deposits in constituents of commercial value, that is to say, the number of ounces of gold or silver, pounds of copper, lead or zinc, or other commercially valuable constituents of said ores or mineral products or deposits measured by standard units of measurement during the period covered by the statement. 6. The gross value of product in dollars and cents."

And section 6 provides in part: "If any such person has sold or otherwise disposed of any of its mine's products at a price substantially below the true market price of such product at the time and place of such sale or disposal, then the State Board of Equalization shall compute the gross value of such portion of said mine's product, * * * which gross value shall be based upon the quotations of the price of such mine's product in New York City, at the time such portion of the product was so sold or otherwise disposed of as evidenced by some established authority or market report, such as the Engineering and Mining Journal, of New York, or some other standard publication, giving the market reports for the year covered by such statement. Should there be no quotation covering any particular product, then the State Board of Equalization shall fix the value of such gross product, or such portion thereof, as shall have been sold or otherwise disposed of at a price substantially below the true market price at the time and place of such sale or disposal in such a manner as may seem to be equitable."

The other sections following relate to the administration of the Act, delinquent taxes, penalties and matters with which we are not concerned upon this inquiry.

Counsel for relators make much of what was said in the "Copper Target," but they overlook that what was said in that publication was designed to explain to the voters what the proponents of the measure were seeking to do, as shown by their advocacy of it, and that the Act so construed would have a deleterious effect upon the mining industry.

Counsel for relators argue that Initiative Measure No. 28 had its foundation upon the metalliferous mines (net proceeds) statute (secs. 2344 to 2355, Rev. Codes 1921), being simply amendatory thereof as prescribing a gross proceeds instead of a net proceeds tax, and the assertion is made that the purpose of the initiative measure was to put a stop to controversies over the interpretation of the metalliferous mines statute; the case of *Anaconda Copper Min. Co. v. Junod*, 71 Mont. 132, 227 Pac. 1001, decided July 7, 1924, being cited. With these arguments, or statements, we disagree.

Initiative Measure No. 28 had but one object—to raise more revenue. In his message to the Eighteenth Legislative Assembly, dated January 2, 1923, Governor Dixon told that body that the license tax on the net proceeds of metalliferous mines was producing an insignificant revenue, and he recommended its repeal, and, to take its place, the enactment of a statute based on gross tonnage. His recommendation was not followed, although a bill imposing a tax upon the gross products of metalliferous mines passed the House, being killed in the Senate. Initiative Measure No. 28 in the main was founded upon that bill. Obviously, it is essential, whether the design is to ascertain the amount of the net proceeds, or the value of the gross product of a mine, at the outset to require correct information as to the gross yield of the mine. But ascertaining the net proceeds from the gross yield and the gross value of the product are two very different things, although to some extent the same information may be useful and the same processes may be employed in arriving at the ends sought to be

34

reached. Deductions allowable in order to ascertain the amount of "net proceeds" obviously cannot be permitted in ascertaining the value of "gross product."

The law providing a license tax based upon the net proceeds of metalliferous mines was blotted out (*Westchester Fire Ins. Co.* v. *Sullivan*, 45 Mont. 18, 121 Pac. 472, 473) by Initiative Measure No. 28, and thereby a new and different law took its place.

The intention of any legislation is the consideration which ▇ must control in its construction, and to ascertain that intention, recourse must first be had to the language employed (*State* v. *Cudahy Packing Co.*, 33 Mont. 179, 114 Am. St. Rep. 804, 8 Ann. Cas. 717, 82 Pac. 833; *Great Northern Utilities Co.* v. *Public Service Com.*, 88 Mont. 180, 293 Pac. 294), and the purpose to be subserved. (*McNair* v. *School District No. 1*, 87 Mont. 423, 69 A. L. R. 866, 286 Pac. 188; *State ex rel. Carter* v. *Kall*, 53 Mont. 162, 5 A. L. R. 1309, 162 Pac. 385.) The presumption is that words used in a statute are intended to be used in their ordinary sense, unless from the context it is apparent that they are intended to be given a different meaning. If there is any doubt as to the meaning of a given term, it is to be measured and controlled by the connection in which it is employed, the evident purpose of the statute, and the subject to which it relates (*Northern Pac. R. Co.* v. *Sanders County*, 66 Mont. 608, 214 Pac. 596), and resort may be had to the history of the statute. (*State ex rel. Federal Land Bank* v. *Hays*, 86 Mont. 58, 282 Pac. 32; *State ex rel. Vickers* v. *Board of County Commrs.*, 77 Mont. 316, 250 Pac. 606.)

The tax provided for by the Act is not a property tax, but ▇ rather an occupation license tax. (*Mid-Northern Oil Co.* v. *Walker*, 65 Mont. 414, 211 Pac. 353; *Norum* v. *Ohio Oil Co.*, 83 Mont. 353, 272 Pac. 534.) The state in effect says to the producers: Your operations deplete the natural resources of the state, and to the extent that you remove from the earth the natural wealth with which nature has provided it, and to that extent impoverish it, you are required to pay a license tax for the use and benefit of the state, for the privilege of

extracting such natural wealth. The tax provided is not, therefore, on metals, minerals, or mine products, but rather upon the business of producing metals or precious stones, based upon annual production.

Whenever the ore from a mine requires smelting, reduction or treatment (as was the case with all involved in this proceeding), the amount of the license tax exacted of the mine operator is determined by ascertaining the market value of the gross product resulting from the smelting, reduction or treatment of the ore. ''The gross value of the product thereof shall be determined by taking the market value of all merchantable metals or mineral products extracted or recovered thereby, as shown by the gross smelter returns of such metals or mineral product in dollars and cents, without any deductions for costs of smelting, reduction or treatment, or otherwise, based upon the average quotations of the price of such metals, or mineral products, in the City of New York, as evidenced by some established authority or market report, such as the Engineering and Mining Journal of New York City, or other standard publications, giving the market reports during the calendar year immediately preceding.'' (Section 3.)

In determining the gross value of the metals under the provisions of section 3 of the Act, calculation is to be made by taking the market value of all merchantable metals recovered, as shown by the gross smelter returns of such metals in dollars and cents, without deduction for costs of smelting, reduction or treatment. This market value is to be ''*based upon*'' the average price of such metals in New York City during the calendar year preceding. Clearly, if such values are to be based upon New York City quotations, differentials must be permitted, otherwise the words ''based upon'' as employed in the section would be meaningless. As to gold, the price here is the same as in New York, but as to the other metals their value in Montana can only be established with reference to the central market quotations, just as the herdsman determines the Montana value of his cattle *based upon* Chicago livestock market quotations, or the Montana wheat grower determines the

value of his wheat *based upon* Minneapolis quotations. Such quotations constitute the basis for the computation of Montana values, and the ordinarily accepted meaning of the words "based upon" is an initial or starting point for calculation. It will be noted that the New York quotations mentioned in section 6 are the *quotations at the time of sale,* and not *the average* of the New York *quotations for the calendar year immediately preceding,* mentioned in section 3. The definition given the "gross value of product" contained in the first part of section 3 has to do only with the value of "marketable metals" either extracted in a free state, as in the case of placer mining gold, or "recovered from the smelting, milling, reduction, or treatment in any manner" of ore mined. Section 6 makes plain the intention of the Act to establish a Montana value rather than a New York value for the metals. It requires that where the producer had sold any of the metals at a price *substantially below the true market price at the time and place of such sale,* then the board shall make computation of the *gross value* of such *metals based upon* New York quotations.

The Act approaches closely, if it does not overstep, the border line of constitutionality when it taxes, on a different basis, property produced and sold during the year, and that produced during the year and not sold until the next year. For illustration, upon some day in the year of production, the miner, needing the money, sells copper in Montana to a purchaser who intends to transport it to some other point, at the price of 12 cents per pound. Upon that day the New York price is 14 cents per pound. The miner, having sold below the New York price "at the time," would be compelled to pay a tax on the copper sold upon the basis of the price of copper that day in New York; whereas his neighbor, holding over his copper, produced at the same time, until after the first of the year, might have to pay upon the basis of only 9 cents per pound, that being the average of the New York price during the preceding year.

Moreover, if the Act is construed to require the fixing of the gross value of the product not sold during the year of production at the average of the New York quotations for the preceding year without any deduction or differential, it would be, in our opinion, of questionable constitutionality under the equal protection clause of the Fourteenth Amendment, which provides that "no state shall * * * deny to any person within its jurisdiction the equal protection of the laws."

In the case of *Louisville Gas & Elec. Co.* v. *Coleman*, 277 U. S. 32, 72 L. Ed. 770, 48 Sup. Ct. Rep. 423, 425, the court said: "In the first place, it may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances [citing cases], and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation. [Citing cases.] It does not, however, forbid classification; and the power of the state to classify for purposes of taxation is of wide range and flexibility provided always that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' [Citing cases.] That is to say, mere difference is not enough; the attempted classification must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis."

In *Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 64 L. Ed. 989, 40 Sup. Ct. Rep. 560, 561, the court said: "But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

In *State ex rel. Northern Pac. R. Co.* v. *Duncan*, 68 Mont. 420, 219 Pac. 638, 640, this court quoted approvingly from the case of *Northwestern Mut. Life Ins. Co.* v. *Wisconsin*, 247 U. S. 132, 62 L. Ed. 1025, 38 Sup. Ct. Rep. 444, as follows: "Classi-

fication must be based upon substantial distinctions which make one class really different from another.''

Where the sale of a commodity produced in this state in effect imposes on the seller, because of economic necessity, a delivery of the commodity in another state, the sale price necessarily includes the cost of delivery to the place designated. Such a sale price does not reflect the worth of the product in this state, but its worth in this state, plus the cost of delivery. (*Hope Natural Gas Co.* v. *Hall*, 102 W. Va. 272, 135 S. E. 582, affirmed 274 U. S. 284, 71 L. Ed. 1049, 47 Sup. Ct. Rep. 639.) It is patent that metals cannot be transported from Montana to New York without entering into interstate commerce. And a tax on the gross value of the products in Montana, determined by the New York price, suggests (if it does no more) a burden on interstate commerce, and renders the Act of doubtful validity under section 8 of Article I of the federal Constitution, if it is interpreted on New York quotations without resort to the principles of differentiation.

Had the draftsmen of the Act intended that the ''gross ▮▮▮▮▮▮ value'' for the purposes of the Act should be the total number of pounds or ounces of metals mined multiplied by the New York average annual quotations, they would have so declared (how easy it would have been to have done that, had that been the purpose of the Act); instead, they declared in set terms that ''the total 'gross value * * * ' shall mean the market value * * * .'' The construction urged would render meaningless the words ''market value,'' in violation of the rule that meaning shall be given to every word and phrase in the statute. The term ''market value'' has a ''plain, definite and well-understood meaning.'' It is ''the price which the property could command in the market.'' (*Atlantic Baggage & Cab Co.* v. *Mizo*, 4 Ga. App. 407, 61 S. E. 844; *James* v. *Speer*, 69 Mont. 109, 220 Pac. 535.) If a product is sold in the vicinity of production, then the price which it will bring there fixes the ''market value'' at that place. (*Standard Chemical Co.* v. *Curtis*, 77 Colo. 10, 233 Pac. 1112.) However, the absence of demand for a product

in a particular place does not mean necessarily that that product has no market value there. (*Atchison, T. & S. F. R. Co.* v. *Stanford,* 12 Kan. 354, 15 Am. Rep. 362.) In such a case a local market value may be created by legal fiction for the purpose of assessing taxes or fixing damages. (*Cumberland Pipe Line Co.* v. *Commonwealth,* 228 Ky. 453, 15 S. W. (2d) 280; *Burr's Ferry, B. & C. R. Co.* v. *Allen,* (Tex. Civ. App.) 149 S. W. 358.) This local market value is based upon, or regulated by, the market value at the point of demand (*Bullard* v. *Stone,* 67 Cal. 480, 8 Pac. 17.), which, in this case, by statute is fixed at New York City. Thus, in ascertaining the local market value of a product it is proper to subtract from the "basic or regulating market value" all charges necessarily and reasonably incurred in placing the product at the point of demand.

It seems to us that the definition of "gross value of product," contained in section 3 of the Act, is conclusive on the subject, and by this we mean to include the entire section— the first sentence, as modified by the second and third sentences. There is no sound reason for the declaration that the "gross value of product" is to be determined by multiplying the total production in pounds or ounces by the New York "quotations of price." All that the Act declares is that the "market value" shall be "based upon" such quotations, which declaration, in itself, precludes multiplication and commands consideration of other elements of computation in arriving at the "market value."

A construction which will obviate constitutional objections is one which contemplates the ascertainment of the *gross value* or *market value* in Montana as the measure for imposition of the tax. That the market value or price for which the product can be sold in Montana is not the market value in New York City must be conceded. However, it is argued by the relators that such a construction is not permissible, in view of the provisions of section 3 prohibiting "any deductions for costs of smelting, reduction or treatment, *or otherwise.*" No difficulty is encountered with this language when it is

viewed in its true perspective. The design is to ascertain the gross value of the product recovered from the smelting, milling, reduction or treatment of the ores. The term "gross smelter returns" includes costs of smelting, reduction or treatment. The words "or otherwise" relate to whatever is incurred in making the gross product. The respondent board correctly so construed the statute: "The tax is measured by 'the gross value of the product which may have been derived by the mine operator from his mining business' as shown by the smelter returns and no deductions are allowable on account of mining costs, freight to smelter, reduction or smelting charges or otherwise." Moreover, we find that two of the three members of the board who drafted the measure and advocated its passage, together with the other member, then acting as the board's counsel, immediately after it became a law, gave it the interpretation above set forth, as to which there has been no modification, although in its published reports made biennially to the governor and to three successive legislative assemblies, as required by law, during the last seven years, no question has been raised or criticism directed against the manner in which the law has been uniformly administered in this respect, until the commencement of this proceeding. It is plain, therefore, that it is the *market value* in Montana of all merchantable metals and mineral products, precious and semi-precious gems and stones, extracted and produced in mining operations in the state of Montana, which is taxable as in the Act provided.

2. The second point is whether the board followed the law in refusing to accept arsenic, crude and refined, or arsenious oxide, as a part of the gross product of the ores. It is the position of the respondents that this product does not come within the title of the Act. But this position is erroneous. Without going over the numerous cases wherein section 23 of Article V of the Constitution has been commented upon, we call attention to *Arps* v. *State Highway Com.*, 90 Mont. 152, 300 Pac. 549, 557, wherein the title of the Act was much more involved than is the one we are considering. We said:

"We are of opinion that the title is sufficiently expressive of the purpose of the Act. No one would be misled or deceived. It clearly appears that the debentures are to be paid from a license tax to be obtained under the Act from gasoline, which could not constitutionally be levied on the commodity itself. Every law is presumed to be constitutional, and all doubts are to be resolved in favor of upholding the law (*State* v. *McKinney*, 29 Mont. 375, 1 Ann. Cas. 579, 74 Pac. 1095, 1096) ; and, accordingly, from the title it is to be presumed that the license tax is imposed constitutionally upon the persons or corporations engaged in the business of distributing and selling gasoline. Although the tax is imposed on the business, it may be that the distributor or dealer passes it on to the consumer. (*State* v. *Sunburst Refin. Co.*, 76 Mont. 472, 47 A. L. R. 969, 248 Pac. 186.) By this constitutional provision it is intended only that the Act shall be germane to the subject expressed in the title. It is not necessary that the title shall embody the exact methods of application or procedure, where the general object is plainly expressed. And where the degree of particularity necessary to be expressed in the title of the Act is not indicated by the Constitution itself, the courts should not embarrass legislation by technical interpretations based upon mere form or phraseology. (*State* v. *Anaconda C. M. Co.*, 23 Mont. 498, 59 Pac. 854.) The test is whether the title is of such a character as to mislead the public or members of the legislature as to the subjects embraced in the Act. (*Evers* v. *Hudson*, 36 Mont. 135, 92 Pac. 462.)"

The Act does not provide for a tax upon precious or semi-precious metals, or upon precious or semi-precious stones. If it did, it would be unconstitutional under the provisions of section 3 of Article XII of the Constitution. It would be in effect an *ad valorem* tax which can only be imposed upon the net proceeds of the mine. The tax is an excise tax upon persons carrying on the business of working or operating any mine or mining property from which the metals and stones are produced. In the body of the Act the license tax is

described and the method of fixing the same and collecting it is prescribed.

The measure relates to one subject only. There is nothing in the title of the Act which tends in any way to mislead the voter. The title is not deceptive; it indicates an Act designed to provide a license tax, requiring all persons engaged in or carrying on the business of working or operating any mine or mining property from which gold, silver, copper, lead or any other metal or metals, or precious or semi-precious gems or stones of any kind shall be mined, extracted or produced, to pay to the state treasurer an annual license fee for engaging in or carrying on the business, fixing the amount of the tax and providing a method for its assessment and collection. The Act itself recognizes that except as to gold and precious and semi-precious gems or stones treatment is required, and whenever the ores require smelting, reduction or treatment to ascertain the metal contents of the ores, it must follow inevitably that the ores to a very great extent must be reduced or dissolved into their primal elements.

Now, the purpose of this Act was to obtain revenue from those severing the ores from their mining claims, the amount thereof being fixed by the value of the product. It is clear enough that as to gold, which has the same value throughout the Union, there need be no test. There must be a test as to the value of the precious or semi-precious stones, because the value of each depends upon its individual characteristic; but all ores must be reduced by some process and most must be treated in order that the same may become merchantable. In reducing the ores for copper, silver, lead or zinc, it follows as a matter of course that if other valuable constituents of the ore are produced in merchantable quantities, they go to make up the value of the ore.

The words "mineral products" are used in the definitive section 3, wherein gross value of product is defined three times, and the expression "any particular product" is used once. There cannot be any doubt that all the commercially valuable constituents of the ores are to be reckoned in ascer-

taining the value of the gross product. Our attention is called to the fact that the ores contain sulphur, sand, clay and numerous other products which counsel for respondents say are commercially worthless. But these are excluded by the very terms of subdivision 5 of section 5 because they are not "commercially valuable" constituents of the ores. Sulphur under the circumstances, as is demonstrated in the brief of the Anaconda Copper Mining Company, by reason of its distance from market and its prevalence throughout the country, is not commercially valuable where it is produced in Montana. The New York price of arsenious oxide is quoted in the Journal designated in the Act, under the head of "Mineral Products." If this "commercially valuable constituent" of ore is excluded from the operation of the present Act, it is because of the declaration found in the first sentence of section 3, that "the total 'Gross Value of Product' * * * shall mean the market value of all merchantable metals * * * extracted * * * or recovered from the smelting, milling, reduction, or treatment * * * of any such ores." But the second sentence of section 3 is as much a part of the definition as is the first sentence, as the whole section declares how the "gross value of product" shall be determined.

In placer mining, and mines from which free milling ores are extracted, the product is metal, and in mining for precious stones, etc., the product is but the gems recovered. But when the ore requires smelting and similar treatment, many products other than actual metal may be produced and saved.

If, therefore, we should hold that arsenious oxide, manifestly a "mineral product" and "commercially valuable constituent" of ore, saved by smelting and reduction, is not to be considered in determining the tax, we would do violence to the rule that every word and phrase in an Act shall be given meaning, if possible. Here the meaning is clear that mineral products as well as metal were intended to be given consideration in making up the total value of the constituents of ore requiring smelting, reduction or treatment. Sentence

3 of section 3 further emphasizes this fact by declaring that "should there be no quotation covering any particular product" the board may fix an equitable value. There can be no other reasonable interpretation placed upon this sentence than that the framers of the Act realized that, in the process of smelting and refining metalliferous ores or deposits, valuable by-products might be saved, and intended that no valuable constituent of the ore should escape the dragnet of the Act. Further, in section 5 the operator is required to report, not only the *metals* recovered by smelting the ore, but also "other commercially valuable constituents of said ores."

Reading Initiative Measure No. 28 in its entirety, it would appear that there is no reasonable basis upon which it can be said that the computation of the gross value of the product can be restricted to the metal content alone. If the ore contains gold, it must be reduced. If it contains silver, copper or lead, it must be smelted. As a constituent of the ores smelted by the Anaconda Copper Mining Company there is a substance of value, which, when the smelting is done, appears as arsenious oxide, which the ores yield in commercial quantities. They are a part of the ores when they come to the smelter, and as they are in commercial quantities it cannot be said that they have evaporated when it comes to ascertaining the value of the ores.

3. The state board of equalization is a powerful constitutional body which, while properly exercising its authority, is supreme in its own sphere. In *State ex rel. Schoonover* v. *Stewart*, 89 Mont. 257, 297 Pac. 476, we said that the board of necessity has a wide discretion in the exercise of its great powers. The authorities generally agree that its decisions, honestly arrived at, cannot be disturbed by the courts. (*Danforth* v. *Livingston*, 23 Mont. 558, 59 Pac. 916; *State* v. *State Board of Equalization*, 56 Mont. 413, 185 Pac. 708, 186 Pac. 697; *People* v. *Millard*, 307 Ill. 556, 139 N. E. 113; *South Spring Ranch & Cattle Co.* v. *State Board of Equalization*, 18 N. M. 531, 139 Pac. 159; Cooley on Taxation, 4th ed., sec. 1288.) And in *Johnson* v. *Johnson, Treasurer*, 92 Mont. 512,

15 Pac. (2d) 842, 844, decided while the motions for rehearing in this matter were pending, we said that the courts will not substitute their judgment "for that of the taxing officials, and, consequently, a mere overvaluation, honestly made, will not be disturbed; relief will only be granted on proof that the taxing officers have pursued a wrong method of assessment or have acted fraudulently or maliciously, or where error or mistake 'so gross as to be inconsistent with any exercise of honest judgment' is shown. (*State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708, 186 Pac. 697; *Danforth* v. *Livingston,* 23 Mont. 558, 59 Pac. 916, 917; *State ex rel. Schoonover* v. *Stewart,* above.) * * * Mere overvaluation of the property, if shown, is not enough to overthrow the order of the board. As stated in *Danforth* v. *Livingston,* above: 'The value of property is a matter of opinion. * * * Absolute accuracy cannot always be attained. Courts cannot be called upon, in every instance, to settle differences of opinion in this regard between the assessing officer and the property owner. Otherwise courts would be converted into assessing boards and * * * would usurp the powers lodged elsewhere.' " But it is otherwise when the board has adopted a fundamentally wrong principle of assessment. (*State* v. *State Board of Equalization,* supra; *State ex rel. Schoonover* v. *Stewart,* supra.)

As the board must determine the market value of the metals produced by each operator, as heretofore defined, it is manifest that it must make certain deductions from the New York quotations on such metals.

The record does not disclose the factors employed by the board when, after public hearings, it determined that the differences in value of the metals in Montana and in New York amounted to 3 cents per ounce on silver, 2½ cents per pound on copper, 1½ cents per pound on lead, and 1 cent per ounce on zinc; these deductions have been consistently maintained and have not been affected by any change in the personnel of the board.

We cannot say, on the record before us, that the board employed a fundamentally wrong method of assessment, except as to the fixing of the value of zinc, or that, if error was committed, it was so gross as to exhibit a failure to exercise honest judgment in determining the matter of values.

It is not within our province to determine, or to direct the board, as to just what items should be included in the deduction from a New York quotation in order to determine the value of a metal in Montana, although, if the record disclosed the factors employed, it would be our duty to determine whether or not each of those factors was correctly employed.

As we have seen, the board has ruled correctly and consistently that "no deductions are allowable on account of mining costs, freight to smelter, reduction or smelting charges or otherwise."

Counsel for relators argue that the board did include certain items of expense, not permissible as deductions under the statute, and quote from a letter received from the board in 1932, in which it is said: "In paying the operator for his metal here in Montana the smelter would of necessity take into consideration the expense it would be put to in the way of freight charges from smelter to refinery and from refinery to market, as well as refinery charges of separating the metals and removing the impurities therefrom and placing the same in merchantable form, together with selling and carrying charges such as handling, insurance, storage and so forth."

Why the board so advised counsel for the relators is not apparent. There is no intimation in the letter that the board has been influenced in its determination by what the smelter pays the mine operator for his metals; on the contrary, it had theretofore declared emphatically that it would not permit the operators to make returns upon the basis of what they received from the different smelters. It made all operators conform to the "differentials which it had fixed," and in the same letter stated that no deductions are allowable

"on account of mining costs, freight to smelter, reduction or smelting charges or otherwise."

Again, at the hearing of this cause, a member of the board, who was not a member when the amount of deductions of "differentials" was determined, stated the differentials "include many things," among others "freight from the smelter to the refinery * * * from the refinery to a market * * * certain carrying charges such as insurance, losses of ore, * * * ," and he said that the cost of additional refining has to be taken into consideration.

From what we have said, this argument does not appear to be consistent with the established policy of the board covering some of the very items mentioned. For the first time we hear of "losses of ore," certainly not an allowable deduction, and freight charges assume an inadmissible phase. It is true that the expense of transporting the product to market is an allowable deduction, and "transportation" may include many items necessary to handling, carrying, under some conditions storage, and delivering the metals.

If the board has honestly erred in some minor matters with respect to the differentials, that alone will not vitiate the assessments. If, as a matter of fact, the board has wrongfully allowed any item of expense in fixing allowable deductions as to any of the metal products mentioned (except as to zinc), it is not made clear upon the record. If, upon an examination of the factors which have entered into its computation, it now finds that improper items have been included, the board must correct its records and the returns made by the various operators conformably with the law and thereafter take such steps as may be necessary to collect any additional amount or amounts of taxes for which the operator or operators are liable.

In fixing the market value of zinc in Montana, based upon the price of the metal in St. Louis, the board clearly violated the law, for the statute requires the New York price to be taken as a basis, and that price shows a differential of .35 cents per pound between St. Louis and New York.

It appears that in requiring the Anaconda Copper Mining Company (and others in like situation, if any) to omit arsenious oxide as a mineral product, or valuable constituent of the ores, the board erred and to that extent adopted a fundamentally wrong principle of assessment, for a principle of assessment, which as a settled policy omits the assessment of large quantities of assessable property, is wrong.

Under the provisions of section 9848, Revised Codes 1921, the writ of mandamus may be issued by this court "to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station."

From what has been said it is clear that the writ should issue to the board, with directions. But it cannot issue to any other party to the proceeding. As the case has been presented, the Anaconda Copper Mining Company, made a respondent, has done no wrong. It has obeyed the orders of the paramount taxing authority of the state, the state board of equalization. It has made every return required by the board and made it according to the board's directions, and upon the forms prescribed by the board.

In its first return the Anaconda Copper Mining Company disclosed that it had produced from its ores a large amount of arsenic. The board, after assessing the same, later, on its own motion, refused to compute any tax thereon, holding that this product "was not and is not a metal product or a mineral within the provisions of Initiative Measure No. 28," and directed that thereafter arsenic should not be included in returns made. In obedience to this direction, the Anaconda Company did not thereafter include arsenic under the gross proceeds law (Initiative Measure No. 28). It would be preposterous now to penalize the company for obeying the orders of the highest taxing authority of the state. It was bound to obey. If it thought the assessment contrary to its rights, it was still bound to obey, in order that it might preserve its right to be heard in court. As it is not shown to have been at fault, it is entitled to be dismissed from the action.

A writ of mandate will issue directed to the state board of equalization, requiring it with all reasonable speed to reconsider the tax assessments made by the various persons who have omitted from their returns arsenious oxide, and to assess the same as omitted property, and then determine the correct amount of the tax and collect the same from those who should pay it.

The board shall also correct the returns made by any and all persons with respect to the value of zinc, deducting .35 cents per pound from the differential.

It shall also, in case it shall find that the deductions which it has allowed have included any item of expense prohibited by law, correct its records and cause to be corrected the returns made by the respective operators, to the end that correct deductions only shall be permitted to stand and that the tax upon the gross products shall be correctly ascertained. And the board shall proceed in all respects in accordance with this opinion.

It appears that the state board of equalization has proceeded in good faith throughout.

It is ordered that as against the Anaconda Copper Mining Company this proceeding be, and the same is hereby, dismissed. The petition in intervention filed herein by the St. Joseph Lead Company is likewise dismissed. The costs of this proceeding shall be taxed against the respondent board, as well as such damages, if any, as may be permitted under the law, including reasonable attorneys' fees, all to be paid by the state of Montana, agreeably to the provisions of section 9858, Revised Codes 1921, as amended by Chapter 5, Laws of 1925. We cannot know now the amount of taxes which may be recovered as a result of this proceeding, which may have a bearing on the amount of the fees to be allowed. The court will retain jurisdiction of this proceeding for the sole purpose of fixing such costs and damages until after the board shall have concluded its reassessment of taxes which have been omitted, and shall have corrected assessments, by reason of errors in construing the statute, as is pointed out in this

opinion, and shall have made its report to this court in obedience to the writ.

The opinion heretofore promulgated is now withdrawn and this one substituted in lieu thereof.

The writ will issue forthwith.

The motions for rehearing are denied.

JUSTICES ANGSTMAN and FORD, Concurring in Part and Dissenting in Part: We agree with the conclusion in the majority opinion to the effect that the value of arsenic or arsenious oxide should properly be included in computing the tax in question, and agree that the writ should issue. We are not able to agree, however, with the majority view that deductions are allowable from the New York City price in computing the gross value of the product under the Act.

The Act in question was initiated by the people in 1924 and took the place of a prior statute, sections 2344 to 2355, inclusive, Revised Codes 1921, which sections were expressly repealed by the Act involved here. The prior statute also imposed a license tax which consisted of an annual fee of $1 together with 1½ per cent. of the net proceeds calculated and computed in the same manner and upon the same basis as the net proceeds of mines are determined for general tax purposes. The net proceeds were determined by subtracting from the value in dollars and cents of the gross product of the mine the following items: "All moneys expended for necessary labor, machinery and supplies needed and used in the mining operations and developments; for improvements, repairs and betterments necessary in and about the working of the mine; for costs of repairs and replacements of the milling and reduction works used in connection with the mine; depreciation in the sum of six per cent. of the assessed valuation of such milling and reduction works for the calendar year ending December 31st and immediately preceding; *also all money expended for transporting the ores, mineral products or deposits from the mine to the mill or reduction works or to the place of*

*sale,* and for extracting the metals and minerals therefrom, and for marketing the product and the conversion of the same into money; but moneys invested in the mines and improvements during any year, except in the year immediately preceding such statement, must not be included in such expenditures, and such expenditures shall not include the salaries, or any portion thereof, of any person or officers, not actually engaged in the working of the mine or superintending the management thereof.'' (Sec. 2090, Rev. Codes 1921.)

In the administration of the net proceeds license tax law (secs. 2344 et seq. 1921), controversies arose as to what were proper items of expenses to be allowable as deductions. The case of *Anaconda Copper Mining Co.* v. *Junod,* 71 Mont. 132, 227 Pac. 1001, 1004, decided July 7, 1924, furnishes an example. With the evident purpose of eliminating these controversies, Initiative Measure No. 28 was proposed and adopted. Instead of making the tax 1½ per cent. of the net, that measure exempted entirely the payment of any tax on the first $100,000 of the gross value of the product, and imposed a tax of ¼ of 1 per cent. of the amount by which the gross value exceeds $100,000 and does not exceed $250,000; ½ of 1 per cent. of the amount by which the gross exceeds $250,000 and does not exceed $400,000; ¾ of 1 per cent. of the amount by which the gross exceeds $400,000 and does not exceed $500,000; and 1 per cent. of the gross in excess of $500,000.

The Act, in making provision for the method of ascertaining the gross value of the product, states: ''The total 'Gross Value of Product' as used in this Act, shall mean the market value of all merchantable metals, precious and semi-precious gems and stones extracted or produced, each year from any mine or mining property in the State of Montana or recovered from the smelting, milling, reduction, or treatment in any manner of ores extracted from any such mine or mining property or from tailings resulting from the smelting, reduction or treatment of any such ores. That whenever the ores require smelting, reduction, or treatment to ascertain the metal contents of such ores, the gross value of the product thereof shall be

determined by taking the market value of all merchantable metals or mineral products extracted or recovered thereby, as shown by the gross smelter returns of such metals or mineral product in dollars and cents, without any deductions for costs of smelting, reduction or treatment, or otherwise, based upon the average quotations of the price of such metals, or mineral products, in the City of New York, as evidenced by some established authority or market report, such as the Engineering and Mining Journal of New York City, or other standard publications, giving the market reports during the calendar year immediately preceding. Should there be no quotation covering any particular product, then the State Board of Equalization shall fix the value of such gross product, or such portion thereof, in such a manner as may seem equitable.'' It is an elementary rule that in construing a statute, the circumstances which led to its enactment, the evils or mischief which it was designed to correct or remedy, and the previous state of the law, may, and properly should, be taken into consideration. (36 Cyc. 1136, 1146.)

Keeping in mind that this Act was to take the place of the net proceeds license tax law and again noting that in determining the net proceeds under the prior law, upon which the license tax was computed, many items were allowable as deductions, including that of the cost of transporting the products from the mine to the milling or reduction works, and to the place of sale, the conclusion is inescapable that when the Act provides that the gross returns in dollars and cents shall be ''without any deductions for costs of smelting, reduction, or treatment, or otherwise, based upon the average quotations of the price of such metals, or mineral products, in the city of New York,'' the intention was to exclude any deductions and particularly those enumerated in section 2090, which were those allowable under the law superseded by the Act here.

Had the framers of the Act intended to allow any deductions, apt language would have been chosen to accomplish that result. And in view of the experience of those who

drafted the Act incident to the administration of the prior Act, were deductions to be allowable the measure would have itemized them with certainty. What was said in *Anaconda Copper Mining Co.* v. *Junod, supra,* which was decided about four months before this Act was submitted to the voters, is equally applicable here. It was there said: "If the legislature had intended that taxes and fire insurance premiums could be taken into consideration as deductible items, it could have easily said so. * * * Were we to place any other construction upon the statutes, the same would be indefinite and uncertain, and in fact there would exist an open field for deductions which in our opinion was never intended." That the New York quoted price is controlling under the Act is made plain by the specific provision in section 3 of the Act allowing the board when there is no quotation covering any particular product to "fix the value of such gross product, or such portion thereof, in such a manner as may seem equitable." The board has no discretion in fixing the value of the gross product when there is a quoted price. Its authority to apply equitable principles in arriving at the value of the gross product exists only when there is no quoted price. If the gross value of product under this Act means the Montana value or the New York quoted price less freight rates and other transportation charges from Montana to New York, then the same meaning must be ascribed to the same terms in section 2090. If this were done, then the value of the gross product under section 2090 (the Montana value) would be the New York quoted price less transportation charges from Montana to New York. And to get the net proceeds there would again be the deduction specified in section 2090 for "all money expended for transporting the ores, mineral products or deposits from the mine to the mill or reduction works or to the place of sale." Hence in determining the net proceeds there would be deduction of transportation charges twice. First, to get the value of the gross product in Montana; and, second, the same deduction from that gross to arrive at the net. As clearly showing the intention that it was the New York City price

and not the Montana value that is controlling, is the provision, in section 3 of the Act which makes the controlling value depend upon "the average quotations of the price of such metals, or mineral products, in the City of New York, as evidenced by some established authority or market report, * * * giving the market reports *during the calendar year immediately preceding.*"

If the market value in Montana was intended to be used upon which to compute the tax, then why does the Act refer to the market quotations for the preceding calendar year as the basis upon which the tax is to be computed? To us it seems plain that the Act was intended to fix a definite and easily ascertained measure of determining the gross value of product, viz., the average quoted New York City price for the year preceding the year of carrying on the operations without any deductions whatsoever.

The construction of the statute by the majority opinion nullifies the phrase in section 3 of the Act, which commands that the gross value of the product shall be determined by taking the market value, "without any deductions for costs of smelting, reduction or treatment, or otherwise." To say that the words, "or otherwise," relate to whatever expense is incurred in making the gross product, renders those words meaningless, for the costs of making the gross product are already excluded as deductions by the words, "costs of smelting, reduction or treatment."

Of the construction placed upon the Act by the administrative board, apparently acquiesced in by succeeding legislative assemblies, it is sufficient to say that such construction would be entitled to respectful consideration were the Act ambiguous. When the history and purpose of the Act is considered together with the specific deductions allowable under the Act superseded by the Act involved here, the statute is so clear and unambiguous as to require no construction. The construction placed upon the Act by the board with respect to allowing differentials on copper, lead and silver is no more binding upon us than its construction to the effect that the

value of arsenic should not be included in determining the gross product, or that a differential should be allowed on zinc greater than .65 cents per pound, and this the majority have held, and we think properly so, was erroneous. Much stress is laid on section 6 of the Act as indicating the intent to make the gross value of the product depend upon the value at the time and place of sale. It is but a re-enactment in practically the same language of a like provision found in section 2090 and in our opinion cannot be said to change the explicit language found in section 3. It should be noted that section 6 has application when the product is sold below the "market price," not below the "market value." The Act as a whole simply recognizes but one "market price," viz., the New York price regardless of the place of sale. There is no discrimination between those operators who sell during the year of production and those who do not. The New York City price is the only price recognized under the Act, wherever or whenever the product is sold. If sold during the year of production, the New York price at the time of sale is controlling. If not sold during the year of production, it is the average New York price for the preceding year that controls.

It should also be said that at the time the Act was before the people the then members of the state board of equalization as well as the defendant Anaconda Copper Mining Company, construed the Act as allowing no deductions whatsoever from the New York price and endeavored to lead the people who adopted it to believe from the statements made by them that the gross value was to be taken as shown by the average quotations without any deductions. In addition to the matters set forth in the majority opinion, "The Copper Target," which it is alleged was distributed to the voters, contained the following statements:

"In the case of a mine which ships to a custom smelter, the product of which is simply ore, which is sold, no deduction is permitted for ore transportation, mill or smelter reduction charges, shipping to refinery, refining, transportation to the ultimate destination and delivery, transportation or selling com-

mission charges. In other words, while the miner merely produces ore and sells it as such, he is taxed as though he were producing refined metal and selling and delivering it himself at the mine, at the New York price. In the case of a mine operator operating his own mill, smelter or other reduction works, who ships to an outside refinery, the above statement is true, beginning at the point of transportation from Montana and continuing to the refinery and so on. In the case of a company refining its product in Montana, no consideration is given to its cost of transportation to the eastern market, selling commission and delivery to the consumer.

"Plainly, the proposed law is as illogical and unfair as if the state of Michigan should place a tax on the gross value of all Ford cars (produced and sold in Michigan at $380 each), by taking $480, the retail price of a Ford car in Butte, as a basis for Michigan taxation, without permitting any deduction for crating, transportation to Butte, local agent's commission, salesman's commission, etc. It is as unjustifiable as if, in the case of a tax on the gross product of a Montana wheat farm, the gross value of the wheat should be determined not by taking the price received on the farm, or even at the elevator where delivered, but at the Minneapolis or London price, without any deduction for transportation, selling or commission."

We refer to what was said at the time the Act was before the voters to show how the Act was then construed by interested parties, and for the purpose of aiding in arriving at the intention.

Had the people thought that differentials were to be allowed, they might have preferred to let the law remain as it was prior thereto, viz., a tax of 1½ per cent. on the net proceeds rather than the greatly reduced percentage on an indefinite part of the gross. We can see no constitutional objection to the Act as thus construed. It applies alike to all operators of metal mines, without discrimination. The different treatment of the operator who sells his product during the year of production and of him who does not is not eliminated by construing the Act as allowing differentials. Neither do we see any constitu-

tional objection to the Act because of burdening interstate commerce. The license tax is imposed regardless of whether the product ever enters into interstate commerce. In any event, if the Act be unconstitutional then the court should have no hesitancy in saying so, in which event the prior license tax law on the net proceeds would remain in full force and effect.

To us it seems preposterous that the framers of the Act intended to allow deductions without in any manner indicating what those deductions should consist of.

A pertinent inquiry, and one not answered in the majority opinion, is: "Just what deductions are allowable under the Act?" Does the matter rest entirely in the discretion of the board, subject only to the exercise of an honest judgment? That seems to be the rule as announced in the majority opinion. The board is commanded to correct mistakes, if any, which it made, but no guidance is given as to what deductions are properly allowable. If the board determines that it has made a mistake, then under the majority opinion it apparently need not correct it unless it also finds that the mistake was not honestly made. It is not likely to make such a finding.

The majority opinion lays stress upon the declarations made by the board that the tax is measured by the "gross value of the product which may have been derived by the operator from his mining business as shown by the smelter returns, and no deductions are allowable on account of mining costs, freight to smelter, reduction or smelting charges or otherwise." These statements by the board are but declarations, in practically the identical language of the statute itself, that it had been complying with the law; but the record before us shows conclusively that in truth and in fact deductions were permitted which are expressly prohibited by the law.

At the hearing before this court one of the members of the board, who was representing the board as counsel, explained what the differential allowed by the board consisted of, as follows: "As to what that differential would be based on, it would take in many things. It would take in the freight from the smelter to the refinery, the freight from the refinery to a

market—that is, probably a seaboard market. Take the case of zinc, it would be St. Louis. In the case of copper it would be New York. It would include certain carrying charges, such as insurance, and losses of ores. It would include the expense of smelting this ore. I do not mean smelting, but refining ore after it had left the smelter. It leaves the smelter with some impurities in it, and all of the metals there assembled in the anodes have to be separated. That is a considerable process. So that the cost of additional refining has to be taken into consideration.''

This statement was in no manner challenged by eminent counsel for the Anaconda Company, by counsel for the intervener, or by any of the counsel appearing as *amici curiae* on behalf of other mining companies. Nor is it of importance that this member of the board was not a member when the differential was originally fixed. He has been a member for four years and presumptively is conversant with the facts and must know the factors going to make up the differential. Furthermore, it would seem that what is a proper differential (assuming that any differential is allowable) is a matter that must be determined each year. Freight rates undergo change; smelting costs may fluctuate. Is it possible that a differential once fixed and established remains the same from year to year, and that a member of the board for the past four years has nothing to do with differentials allowed each year, simply because the system was in vogue, and a differential already fixed, at the time he became a member of the board?

A deduction of 3 cents an ounce was made on silver, $2\frac{1}{2}$ cents a pound on copper, $1\frac{1}{2}$ cents a pound on lead, and 1 cent a pound on zinc.

In addition to the explanation as to the various items which make up these differentials as given by a member of the board, who represented it in this action, the differentials themselves suggest that an allowance was permitted for treatment, and reduction. We think it a reasonable assumption that the freight, commission and insurance would be no greater on

copper than on lead or zinc, yet a substantial difference in the deduction is allowed. This, when considered in the light of the pleadings, shows that the member of the board was correct when he advised the court that the differentials included refining ore after it leaves the smelter. "It leaves the smelter with some impurities in it, and all of the metals there assembled in the anodes have to be separated. This is a considerable process. So that the cost of additional refining has to be taken into consideration." How a deduction for refining costs can be allowed in the face of the express declaration of the Act that no deduction shall be made for cost of smelting, *reduction, or treatment or otherwise* is beyond our comprehension.

If the court cannot take the uncontradicted statement of one of the members of the board, representing the board at the hearing before this court, as to the factors going to make up those differentials, then it is difficult to conceive of any means of ascertaining what those factors were. Accepting his statement regarding the factors going to make up the differentials, it is plain that deductions were made for costs of reduction and treatment which are clearly excluded by the plain wording of the statute. This being so, it would seem to follow, of course, that to this extent also the board adopted a fundamentally erroneous system, even though some deductions may be allowable (but this we do not concede).

Nor will it suffice to say, as do the majority, that, "if the board has erred in some minor matters with respect to the differentials, that alone will not vitiate the assessments." With a greater degree of propriety might it be said that the differential on zinc to the extent of .35 cents per pound is a minor matter that does not affect the validity of the assessment, and yet as to that the majority hold, and we think correctly, that the board violated the law. If it has allowed deductions expressly prohibited by law, it certainly has adopted a fundamentally erroneous system of assessment.

If the board may allow a deduction of 2½ cents a pound from the average quoted copper price, as it has done here,

60

then what is to prevent it, if it sees fit, from allowing a deduction of 3½ cents or 4½ cents per pound? The same question may be propounded with reference to lead, silver, and zinc. Under the majority opinion as we read it, when considered in the light of the facts here shown, the only limitation upon the amount of deductions allowable by the board is that which the board in its discretion may see fit to allow, save that it must not act fraudulently or maliciously or make a mistake or error so gross as to be inconsistent with the exercise of honest judgment. In other words, as we understand the opinion, it holds that unless the error is so gross as to preclude the exercise of honest judgment, the allowance of deductions prohibited by law is not alone sufficient to affect the legality of the assessment. To this we cannot assent.

Also to the extent that the majority opinion directs the board to assess the arsenious oxide as omitted property we think it erroneous.

The law applicable to the assessment of omitted property (sec. 11, p. 13, Chap. 3, Laws of 1923) has relation to *ad valorem* taxes, and not to license taxes such as are here involved.

What the board should do is to proceed under section 9 of the Act here under consideration, to the end that the returns shall be corrected so as to include the arsenious oxide and the license tax computed accordingly without the allowance of any differentials. Whether under the circumstances, and in view of the pleadings, the penalty there imposed should be exacted, is not before us, and hence we express no opinion thereon.

On Motions to Tax Costs, Assess Damages and for Alias
Writ.

(Submitted January 24, 1933. Decided February 8, 1933.)

MR. CHIEF JUSTICE CALLAWAY delivered the opinion
of the court.

Pursuant to the opinion promulgated December 13, 1932, the
court on that day issued its writ of mandate directed to the
respondent State Board of Equalization, commanding action
in accordance with the opinion.

On December 19 the board made its return to the writ
wherein it set forth, in short, that it had obeyed the mandate
in all particulars.

On that day, December 19, the respondent Anaconda Copper
Mining Company filed a memorandum of its costs and dis-
bursements and a petition in support thereof. The items
claimed are as follows:

Printing briefs for appearance in supreme court.....$ 257.00
Paid to stenographer for copies of transcript of hear-
 ing on petition for alternative writ of mandate
 in the supreme court......................... 63.70
Attorneys' fees ................................... 1,000.00

Thereafter the relators filed a motion to strike the memo-
randum from the files, at the same time filing an answer to
the petition.

On the twelfth day of July, 1932, following the rendition
of the original opinion, the relators filed a memorandum of
their costs and disbursements, together with a petition pray-
ing for the allowance of the same, in which they claimed
$294.95; and on the twenty-sixth day of January, 1933, they
filed an affidavit for the purpose of showing their damages,
in the nature of expenses incurred by them in the matter,
other than attorneys' fees. Included in the affidavit were the
items which go to make up the sum claimed in the memoran-
dum filed July 12, 1932; the other items, except two which
will be referred to later, consist of expenses incurred by the

62

attorneys in preparing for and presenting the cause upon the trial.

1. Clearly the Anaconda Copper Mining Company is not entitled to tax as costs the item of $63.70, being the amount paid to a stenographer for copies of a transcript of the proceedings on the hearing in this court. (*State ex rel. King* v. *Second Judicial District Court*, 25 Mont. 1, 63 Pac. 402; *Montana Ore Purchasing Co.* v. *Boston & Montana C. C. & S. M. Co.*, 27 Mont. 288, 70 Pac. 1114; *Montana Ore Purchasing Co.* v. *Boston & Montana C. C. & S. M. Co.*, 33 Mont. 400, 84 Pac. 706.) Nor is it entitled to recover any sum for attorneys' fees. The statutes do not make any provision for such, and no authority has been cited in support of the claim made.

As the complaint was framed, the Anaconda Copper Mining Company was a proper, though not a necessary, respondent. Upon the issues as made up, and upon the admitted facts, the respondent company was found to be not guilty of any wrong, and, the writ being directed only to the respondent board, the action as to the respondent company was dismissed. Is it entitled to recover its costs "for printing briefs for appearance in the supreme court"? We determine that it is not. While it is true that it did not come into the action voluntarily, and as the issues were resolved a judgment was not rendered against it, it cannot be said to be a prevailing party. The relief asked by it was that the writ be not issued. In this it did not prevail, and the writ was issued, as a result of which the State Board of Equalization shows that the respondent company was obliged to pay to the state over $20,000 on account of additional taxes levied against it.

The various items claimed by the Anaconda Copper Mining Company as costs and disbursements are disallowed.

2. The relators are entitled to the costs claimed by them in their memorandum of July 12, and also to the additional sum of $32.10 due to the Tribune Printing & Supply Company for a balance due on printing relators' briefs.

They are no more entitled to the item, reimbursement for a transcript of the arguments made at the hearing in this court, than is the Anaconda Copper Mining Company.

The other items claimed by relators by way of damages, which consist of expenses incurred by their counsel, will not be allowed separately (and we reserve judgment upon the propriety of some of them), but we take them into consideration in fixing the attorneys' fees now to be allowed.

Relators are entitled to damages in the way of expenses incurred for the services of lawyers employed by them to bring and carry on this proceeding. (Sec. 9858, Rev. Codes 1921, as amended by section 1, Chapter 5, Laws of 1925; *State ex rel. Shea* v. *Cocking*, 66 Mont. 169, 28 A. L. R. 772, 213 Pac. 594; *State ex rel. Golden Valley County* v. *District Court*, 75 Mont. 122, 242 Pac. 421.) This is provided for in the opinion, the matter being postponed until the return of the writ.

It was agreed by counsel for relators that as this court by reason of the varied experiences of its members is familiar with the value of attorneys' fees, we may, without the necessity of taking evidence, fix and allow such attorneys' fees for relators as may be deemed just and reasonable. This course is agreeable to recognized practice in this state. (*Bohan* v. *Harris*, 71 Mont. 495, 230 Pac. 586.) We now fix and allow the sum of $5,000 as a reasonable attorneys' fee to be allowed to the relators as damages in this proceeding.

Relators' costs in this proceeding, while taxed against the respondent board as a matter of form, and the damages awarded relators, including the attorneys' fee fixed, are awarded to them and shall be recovered by the relators from the state of Montana, which was represented in this proceeding by the State Board of Equalization; and it is hereby adjudged that the amount of costs, to-wit, $327.05 costs, and $5,000 damages (attorneys' fee), are a proper claim against the state of Montana and are to be paid as other claims against the state are paid, pursuant to the provisions of sec-

64

tion 9858, Revised Codes of 1921, as amended by section 1, Chapter 5, Laws of 1925.

3. In the objections by relators to the return made by the respondent State Board of Equalization it is alleged that the return is insufficient in law on the face thereof, in that "it makes no return in fact and only of legal conclusions by the board," and is uncertain. We shall not stop to consider these objections, as we do not deem them meritorious.

The third, fourth, fifth, sixth and seventh objections are based upon allegations that the return is false. In the fourth objection the relators have pleaded particulars in which they say the board erred in fixing deductions from the New York City prices of 3 cents an ounce for silver, 2½ cents an ounce for copper, 1½ cents an ounce for lead, 1 cent an ounce for zinc, and in allowing other deductions. They pray that an alias peremptory writ of mandate issue to the State Board of Equalization commanding it to strike "all items of differentials heretofore employed by them, all items of expense allowed or included therein in violation of said law," and so forth.

The "objections" are verified after the fashion of a pleading. But it must be remembered that this cause was argued and submitted as upon a motion for judgment on the pleadings—presenting to this court questions of law only, it being agreed by counsel for the relators and respondents that it should be deemed that no disputed issues of fact were involved. The three questions submitted for decision are set forth specifically in the opinion.

It should go without saying that if the respondent board has not complied with the provisions of the writ, this court has the power, and it is its duty, to compel it to do so. (38 C. J. 939; *Palmer* v. *Jones*, 49 Iowa, 405.)

The objections present issues of fact which may not be tried in this proceeding. They call for findings not within the issues framed by the pleadings, not within the theory upon which the case was presented, and clearly not within the questions sub-

mitted for decision. This court will not now try a question which was not litigated when the cause was on trial. (*State ex rel. Rowling* v. *District Court,* 41 Mont. 532, 110 Pac. 86.)

If the pleadings presented the issue, what factor or factors may be taken into consideration in fixing differentials?— which they do not—that issue could not be decided without taking testimony, in all probability a considerable volume of testimony; and that should not be done without reframing the pleadings in order to keep the inquiry within due bounds. If the court were to appoint a referee, he would have nothing to serve as a guide to the scope of the inquiry; the result would end in confusion and perhaps in a failure to investigate questions necessary to a complete and final judicial determination.

The only questions which have been presented and resolved in this proceeding are legal ones, except that it was admitted that the board had failed and refused to assess arsenious oxide; and upon the admitted facts, the law being interpreted correctly, it followed that the board had erred in fixing the differential with respect to zinc. Otherwise, questions of fact were not presented nor determined. If relators desire to pursue the inquiry which they have sought to present in their objections to the board's return, they must do so in some other proceeding before an appropriate tribunal. The objections are overruled.

ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

MR. JUSTICE ANGSTMAN, Concurring Specially: Treating the majority opinion in the main case (*State ex rel. Snidow* v. *State Board of Equalization, ante,* p. 19, 17 Pac. (2d) 68), as *stare decisis,* I subscribe to the foregoing, but I do not recede from my position as set forth in the dissenting opinion of Mr. Justice Ford and myself.