[No. 6188.]

THE SMUGGLER-UNION MINING COMPANY v. KENT ET AL.

1. **Inspection of Mines**—The provisions of sec. 364 of the Code apply only where there is a pending suit involving the title to or some interest in the mine. An action by one claiming as a tenant, and demanding damages for a wrongful eviction, is not within its provisions.—(323)

Where the plaintiff claims under a lease of only a portion of the mine, an order for the inspection of the whole property is error, unless it is made to appear that an inspection of that part of the mine not included in the lease would afford evidence tending to establish the plaintiff's demand.—(324)

The plaintiff demanding damages for an alleged eviction, and averring the extraction and conversion by defendant, since the eviction, of large bodies of valuable ore, and that other like bodies of ore had been left in the mine, to all of which plaintiff was entitled, an order for an inspection with a clause that if inspection were refused the defendant's evidence should be confined to the period prior to the ouster, unless plaintiff himself

should give evidence as to the conditions subsequent to the ouster, was held in error.—(324, 325)

And the exclusion, on the ground of disobedience of the order, of evidence on the part of defendant 'tending to show improper mining, by plaintiff, on account of which he was evicted, and large expenditures necessarily made by the defendant, subsequent to the eviction, to restore the mine to proper condition, was error.—(325, 326)

2.    Evidence—Variance—Allegation of the lease of the whole of a mine, at a specified royalty, is not supported by evidence of a lease of a portion of the mine at a different royalty. The case exhibits a failure of proofs, and the defendant is entitled to a judgment of nonsuit.—(327)

3.    Pleadings — Amendment — An amendment of the complaint, after trial, to correspond with the proofs, should be denied where plaintiff's attention was called.to the variance before and repeatedly during the trial, and he had then assumed the position, and induced the court to rule, that the variance was immaterial.—(327)

4.    Damages — Profts — Evidence — The sole purpose of a lease of mining premises is profit, and in case of a wrongful .eviction the lessee will, on adequate proof, be entitled to what he would have gained by the operation of the mine, if not disturbed. But where, by the plaintiff's own showing, no profit could have been gained, under the peculiar conditions set down in the lease, as to the removal of the ore, he is not to be allowed anything as for profits lost.—(329-331)

Evidence as to profits upon certain ores removed by special permission through a different shaft than that specified in the lease, held incompetent as a basis upon which to compute profits.—(331)

The computation of profits, upon the assumption, without evidence, and contrary to all the evidence, that the vein continued, unbroken, regular, and uniform in the quantity and value of the ore, for the distance of 800 to 1,000 feet, from that level to the surface, was improper.—(332)

5.    Evidence—Presumptions—There is no presumption that a vein exposed hundreds of feet below the surface will be found within the side lines at the surface, and carry, through the intervening space, the same volume and grade of ore. The case of Armstrong v. Lower, 6 Colo. 393, is no authority for such a presumption.—(332)

6.    Verdict—Insufficient Evidence—A verdict for substantial damages, without evidence to support it, will be vacated.—(333)

(21)

*Appeal from San Miguel District Court*—Hon.
Theron Stevens, Judge.

Messrs. Howe & Adams, for appellant.

Messrs. Bell, Catlin & Blake, for appellee.

Mr. Justice Campbell delivered the opinion of
the court:

The plaintiffs, who allege that they are lessees
of the Carruthers lode mining claim in San Miguel
county, brought this action against The Smuggler-
Union Mining Company, the alleged lessor, for dam-
ages occasioned by their wrongful eviction by the
lessor, and obtained a judgment from which defend-
ant appeals. The assignment of errors contains
many specifications. As the judgment must be re-
versed because it is not based upon sufficient legal
evidence, only the objection on this ground and such
other specifications as might be material in the event
of a new trial will be considered.

1. After the issues were made up and seven
days before the date set for the trial, plaintiffs de-
manded of defendant a copy of the lease under which
they claim they entered, and for an inspection of,
the mine. A copy of the lease was given to them by
defendant on the following day, but the demand for
inspection was refused. Three days later plaintiffs
filed their verified petition in the action in which they
asked for an order granting them leave to inspect
the mine, upon the ground that an examination was
necessary to enable them to prove the allegations of
their complaint, particularly that the defendant com-
pany, immediately after the wrongful eviction, en-
tered into the mine and removed therefrom large
bodies of valuable mineral-bearing rock which were
left exposed by plaintiffs before they were ousted.
Defendant resisted the petition and filed an affidavit

stating, among other reasons for their refusal to let plaintiffs into the mine, that the premises were not then in its possession, or under its control, but were leased to other parties. The affidavit also denied that there was any necessity for an inspection. On the same day the court issued an order for the inspection. It was not absolute, but provided that, if defendant refused to permit the examination, then, in the production of its evidence upon the trial, it should be confined to the condition of the mine and its ore bodies at and before the time of the ouster, "unless the plaintiffs elect to and are permitted to go into developments since the ouster." Defendant again refused to permit the examination and objected to the order, and preserved its exception, and renews the same here.

This application was not made under sec. 364 of the Code, as that applies only where there is a suit pending involving some title or interest in the mine itself (*People ex rel., etc., v. De France,* 29 Colo. 309), but is based upon the inherent power of a court of equity to permit an examination of the subject-matter of an action. Defendant strenuously contends that such an order, in a case like this, and under such issues, is without precedent and wholly beyond the power of the court in the absence of a permissive statute. In *Montana Company v. St. Louis Mining & Milling Company,* 152 U. S. 160, it was said that courts of equity have frequently granted such orders, and while the custom is not decisive of the question, the right to make them has never been denied by the courts. The observation may not have been necessary to that decision, because the inspection there was granted under authority of a statute; but, in passing upon the constitutionality of the statute, the court said, that if courts of equity, by virtue of their general powers, have such authority in a case pending before

them, the state, by statute, may authorize the courts
to order an inspection in advance of the suit. This
case may be decided without determining whether
the authority which plaintiffs invoke is an inherent
power of an equity tribunal. If it is assumed that it
is, it is quite clear that the order in this case was
wrong. Three days before it was made plaintiffs
received from defendant a copy of the lease under
which they claim, and therefrom must have known,
for it is therein expressly recited, that the lease was
only of that portion of the Carruthers vein lying and
being above the level of the Sheridan cross-cut tun-
nel, which crosses the Carruthers lode, and extend-
ing from such level to the surface of the Carruthers
claim. Notwithstanding plaintiffs had a lease only
for this portion of the vein, they asked, and received,
of the court, an order for an inspection of the entire
Carruthers mine and every part thereof, for the pur-
pose of examining it. Certainly plaintiffs' right of
inspection, if it existed at all, extended no farther
than to that portion of the vein which was covered by
their lease. At least it was not claimed that an in-
spection of other premises would furnish evidence
tending to establish the allegations of the complaint
concerning the leased premises. Defendant, there-
fore, had the right to refuse the demand for inspec-
tion as it was made, and the court was wrong in
making the broad and comprehensive order that it
issued.

But there are other, and equally conclusive, rea-
sons why the order was wrong, harmful to defendant
and resulted in obstructing the due administration
of justice. Let us consider for a moment its mean-
ing and effect. The court apparently was in doubt
about its power to compel defendant to admit plain-
tiffs into the mine; otherwise the order would prob-
ably have been made absolute. Its alternative char-

acter contemplated the possibility that defendant might disregard it, and as a penalty for the anticipated disobedience, provision was made, in that event, that no evidence of the mine's condition subsequent to the ouster should be produced by defendant, unless plaintiffs themselves opened the door by first producing similar evidence. As plaintiffs for six months worked the vein, they knew as much about the condition of the mine at the time of the ouster as defendant did, and no further examination by them was needed to get evidence on that issue. But, there were other important and controverted issues involved: that defendant extracted and removed large bodies of valuable ore after the ouster, and that other large and valuable ore bodies were still left in the mine, all of which plaintiffs claim they would have worked at a large profit had they not been evicted; and the defense in the answer that plaintiffs were rightfully ousted because they were guilty of a breach in that their methods were injurious and unworkmanlike. It needs no argument to show that these issues could not be satisfactorily determined without reference to subsequent work and development, if any, and without careful examination and measurements and tests made after the eviction occurred. In other words, subsequent conditions would throw the only satisfactory light upon these important issues of fact, and furnish more certain and reliable proof than would the character of evidence to which defendant was restricted. Palpably erroneous, therefore, was the order which not only tied defendant's hands unless plaintiffs themselves chose to loosen them, but put it in the power of plaintiffs to close the door to the best, the only reliable and certain, data with respect to the question of profits, the vital issue in the case. The trial court, even had it possessed the power, abused its discretion in im-

posing such a condition or penalty as this order contains. If plaintiffs were entitled to go into the mine to secure evidence to prove their case, the order should have been made absolute; but the court committed error when it invested them with power to keep out of the case the only reliable evidence upon which the issue of profits could be determined. So also when defendant attempted to prove its defense that plaintiffs were lawfully evicted because they did their work improperly, and when it offered to prove the work (and its cost), which had to be done to restore the mine to a proper condition, the court again committed error by rejecting the offer on the ground that defendant withheld its consent to an inspection which, as we have seen, it could not be coerced to give.

2. There is grave doubt if plaintiffs proved a lease from defendant. The complaint alleges that the mine was first leased to the plaintiff Dunlap and B. L. Gearing, but they refused to accept the tendered written instrument of leasing and renounced all their prospective rights thereunder, and afterwards by consent of defendant, plaintiff Kent was substituted in place of Gearing, whereby Kent and Dunlap were to have the same rights which formerly were intended to be granted to Dunlap and Gearing. The evidence is uncontradicted, even plaintiffs themselves admit it, that Dunlap and Gearing never accepted the lease which defendant proposed to give them. It is a little difficult to understand how Kent and Dunlap, as substituted lessees, ever acquired any rights under a lease which was never accepted by their predecessors, if the only thing the former acquired was that which the latter might have secured, but which they would not assent to. But if it be assumed, for the purposes of this case, that Kent and Dunlap, the plaintiffs here, accepted the lease in

evidence, and entered upon the premises thereunder, and for a time mined ore therefrom, it is entirely clear that the lease which they produced in evidence, as the measure of their rights, is not the lease which they allege in their complaint, but is a materially different one.   Defendant objected upon the ground of the variance; but the court, in accordance with the contention of the plaintiffs, held that the variance was not material.   The lease, as alleged in the complaint, was of the entire Carruthers lode.   The lease produced in evidence was only of a fractional part thereof, as hereinbefore set forth.   The royalty alleged in the complaint was a straight $12\frac{1}{2}$ per cent. royalty on the returns of all ores mined and disposed of.   The royalty provided for in the lease, which was produced in evidence, was a royalty of 25 per cent. upon the proceeds of specimen and shipping, and of $12\frac{1}{2}$ per cent. on milling, ores.   Such a variance is material, and the court should not have received the written lease as evidence without permitting an amendment of the complaint.   It is no answer to say that no specimen or shipping ores were produced.   That circumstance does not affect the character of the lease, or the question of variance between the lease as pleaded and the lease which was offered in evidence.   Plaintiffs, doubtless later concluding that the variance was, or might be held, material, asked permission, after the trial, to amend the complaint by making its allegations concerning the character of the lease conform to the proof; but the court very properly withheld its permission, not only because plaintiffs were dilatory in making the application, having known of the variance before the trial began and their attention having been specially called thereto repeatedly during the trial, but also because it had been induced to hold, during the trial, upon plaintiffs' contention, that the variance was im-

material, though the contrary was maintained by defendant. Manifestly plaintiffs could not be allowed during the trial to say that the variance was immaterial and afterwards that it was material and have an amendment made to the complaint. The variance was harmful to defendant. There was a failure of proof on this issue and defendant's motion for nonsuit should have been granted.—*People's M. & M. Co. v. Central C. M. Co.,* 20 Colo. Ct. App. 561.

3. The most serious and prejudicial error concerns the award of damages. Plaintiffs in their complaint and in their evidence sought to recover as damages only the profits which they claim they would have realized had they not been ousted. There was evidence by plaintiffs tending to establish a wrongful ouster, and the thwarted attempt by defendant, as hereinabove stated, to produce evidence tending to show that the eviction was proper. Assuming for our present purpose that the eviction was wrongful, and that in all other respects plaintiffs proved their case, we pass to the assignment of error that the verdict on which the judgment for plaintiffs was rendered is not based upon any reliable or sufficient evidence. Defendant contends that anticipated profits of a mining venture are not a proper element of damages where a tenant is wrongfully evicted before the termination of his lease. The general rule is that prospective profits are not a proper element of damage, but the rule is not universal and there are certain well known qualifications. Where the very object of a mining lease, as in this case, is the making of profits by the lessee, such must have been within the contemplation of the parties to the lease at the time of its execution, and it was likewise within their contemplation that, in case of a wrongful eviction, the lessee will be entitled to recover profits, provided his proof is adequate. This rule is recognized in *Anvil*

*Mining Company v. Humble,* 153 U. S., p. 540. In that case, however, the proof was quite different from the evidence in the pending case, as we shall hereafter see. In *Ramsay v. Meade,* 37 Colo. 465, in the case of an established commercial business, profits as a proper element of damage were recognized. So, also, in *Rio Grande Western Ry. Co. v. Rubenstein,* 5 Col. App. 121. In *Isabella G. M. Co. v. Glenn,* 37 Colo. 165, 170, profits were held an element in the measure of damage in a case of wrongful eviction of a lessee of a mine, while in *Milheim v. Baxter,* 46 Colo. 155, 103 Pac. 376, a case where a tenant was evicted, profits were not allowed on account of an inadequate basis for their ascertainment. This is a case where the only recovery asked is prospective profits and, as they are the true measure of damages herein, the inquiry is whether proof of that issue was made.

We proceed to search the record to see what it exhibits on such issue. The lease under which plaintiffs claim provides that all ores shall be taken out of the mine through the seventh level and down the Union shaft. The ores extracted by plaintiffs during their six months' occupancy consisted of two separate lots, which, by special permission of defendant, they took out through the Sheridan shaft. But all parties understood and say that this was not of right, but a special privilege limited to the two shipments. It was because of this designated method of removing ores contained in the lease tendered to Dunlap and Gearing that they refused to accept it, and Kent knew this before he began negotiations with defendant. Both of the plaintiffs say that because of the condition of the seventh level and the Union shaft, of its distance from the leased premises and for other reasons not necessary to mention, no profits could be made in working the mine if the

lessees were confined to that outlet for their ores. At the very time plaintiffs were evicted they say that they were negotiating with defendant for taking out ore through the Sheridan shaft, but permission would not be given because other lessees and the defendant were constantly using it. Before plaintiffs' rights attached they knew of the impracticable and unprofitable method of removing ores to which the lease restricts them, and so obtained from defendant the promise that if they built a mill for treating the ores a three years' extension of the lease would be given. Plaintiffs, however, did not, as they expressly say, bind themselves to build, but merely might do so if they saw fit, in which event the extension would be granted. Nothing is said in the complaint about plaintiffs' ability, willingness, or readiness to build a mill, or that they ever intended to do so. While on the stand both of them testified, at one time, that they could make no profit if confined to the Union shaft in taking out ore; elsewhere, and later, they qualified this evidence with the statement that at an expense of about $300.00 they could have repaired the Union shaft and passageway thereto, and that they could have then made some profit, provided they built a mill and secured from defendant further concessions, which defendant was not obliged to give, such as a right of way through a certain tunnel. Upon this evidence of plaintiffs themselves, defendant insisted that they had disproved their own case and asked a direction to the jury to that effect. In passing upon this motion, the trial judge said that plaintiffs' testimony was contradictory and inconsistent, yet he thought the matter should be submitted to the jury to determine which claim of plaintiffs was true. The judge evidently overlooked, or for the moment forgot, a previous and correct ruling which he had made, that because plaintiffs had not averred in their

complaint that they were able, willing, and ready to build a mill, no consideration could be given by the jury in estimating profits as to what might have been realized if a mill was built.   In other words, all reference to a mill was foreign to the case.   It is entirely clear, therefore, that plaintiffs themselves, in correcting or explaining their former testimony that profits could not be made if they were restricted to the seventh level and Union shaft, in no respect helped their case, because they said that profits might have been realized provided they built a mill and got certain rights of way.   They also said that if they were unable to use the Sheridan shaft, or could not get permission to make a new mill hole near it, then they intended to build the mill, not that they would repair the main shaft and passage ways thereto.   Such explanatory evidence is entitled to no weight whatever, and forms no basis for a verdict in plaintiffs' favor on the issue of profits.   It is uncertain and depends on too many contingencies to make it of any value.

In other respects the evidence of profits was insufficient.   In view of plaintiffs' admission that no profits could be made if they were confined to the Union shaft, evidence as to profits which they made out of two special shipments taken out through the Sheridan shaft by permission of defendant was manifestly improper as a foundation on which to compute profits if the lease was worked and the ores removed as its terms provided.   Yet such incompetent evidence was the basis on which plaintiffs estimated their profits for milling ores which they claim they could have extracted had they not been ousted. During the six months they were in possession, they did only about fifteen feet of development work in running a drift, the ores they took out being from workings on the vein opened by previous lessees or

the defendant. The court permitted them to testify, though the figures are not given in the record, as to the quantity of ore left in the mine which they say they could have taken out during their lease, and this quantity they arrived at by a mathematical computation based on the conditions in the.vein as they saw them and on the further assumption that the vein continued unbroken, regular and of uniform richness 800. to 1,000 feet to the surface, to its supposed outcrop within the side lines of the claim. And yet the evidence by mining engineers and experts was uncontradicted that the ore bodies in the mine at the time of the eviction were not so exposed or developed as that any definite or reliable or reasonably accurate estimate or calculation could be made as to the amount thereof, even if the vein extended to the surface. The evidence was all one way that the vein, as worked by plaintiffs and lessees in this mine, and in mines generally in that section of the country, was pockety and irregular and not uniform in value. We know of no law or principle that warrants the presumption that the vein in a mine exposed hundreds of feet below the surface will on the upward dip come to the surface within the side lines of the claim and continue all the way of the same richness as where actually exposed. Nevertheless the court, in ruling on defendant's objection to this kind of evidence and to plaintiffs' basing their estimate of quantity and value on such presumptions, said that they might do so, observing that, under the conditions shown, it is not more unreasonable to presume that the vein would continue to the surface than it is to presume that people will continue to eat. We are aware that in *Armstrong v. Lower,* 6 Colo. 393, this court said that when one has discovered a lode upon the unappropriated public domain, and has, within

the proper time, in good faith, performed all of the subsequent acts essential to a valid location, as provided by law, he is entitled to the presumption that his lode extends on its strike throughout the full length of the claim.   In the same case, at page 581 of same volume, the court more accurately stated the proposition by saying that if such accompanying facts are proved, the jury may infer therefrom, in the absence of contradictory proofs, that the vein extends on its strike throughout the entire claim. These observations were made in a controversy between conflicting mining claims, and this presumption was indulged in favor of the first locator.   This, however, is not authority for the proposition which the trial court laid down in this case, where the question is as to the volume and value of ore in a mine, that a vein exposed at a certain place therein will continue on its *dip* either upward to the surface or indefinitely downward and of the same size and value throughout.

Plaintiffs may have produced enough evidence as to the profits they made out of the two lots of ore which they mined and milled by special permission of defendant, but they failed to prove that they would have made any profits, even out of these shipments, had they mined and removed the ores as they were required to do by the lease, as the trial court said.   And it is altogether clear that they produced no reliable or reasonably certain evidence either as to the quantity or value of the ores that remained in the mine after the ouster, and which they might have milled during the remainder of their term, or that there would have been any profits.   On the contrary the evidence is wholly conjectural and consists of mere guesses, as the trial court itself suggested. The witnesses did not even purport to consider their

estimates otherwise. Indeed, when the order for inspection in effect delegated to plaintiffs the right to keep out the only kind of evidence which might throw light on this issue, and when plaintiffs elected to exercise such right by confining its evidence to conditions before and at the time of ouster, it necessarily resulted that the only kind of evidence left was of this unsatisfactory character. And so it is not surprising that plaintiffs in their testimony say they could have taken out ores of the value of at least $900,000.00 and would have surely made $200,000.00 profit during the remaining eighteen months of their term had not their possession been interfered with, notwithstanding they swear that during their six months occupancy they removed and milled ores extracted by stoping on the vein, which, so far as it had been exposed at all, was the result of the work of others, of the gross value of only $5,000.00, and at a profit of $3,500.00 to $3,800.00. The jury returned a verdict for $5,000.00 in favor of plaintiffs. It might just as well have been for $250,000.00. There is no evidence at all upon which the verdict can rest. It is purely speculative. The estimate of plaintiffs' witnesses as to quantity and value, as well as the verdict of the jury, is conjectural—the result of guess work. A judgment based on such a foundation cannot stand.

Out of many authorities that might be cited in support of our conclusion, we refer to *Central Coal and Coke Co. v. Hartman,* 111 Fed. Rep. 96, where Sanborn, circuit judge, in an exhaustive and discriminating opinion, discusses profits as an element of damage in such cases.—1 Sutherland on Damages (3d ed.), § 59 *et seq.;* 3 Sutherland on Damages (3d ed.), § 867 *et seq.;* 13 Cyc., pp. 36, 49-53, 157, 161, 212, 213, 219; 8 Am. & Eng. Enc. Law (2d ed.), pp. 616-626; *Boston & Albany R. R. Co. v. O'Reilly,* 158

U. S. 334; *Howard et al. v. Stillwell, etc., Co.,* 139 U. S. 199.

The judgment is reversed and the cause remanded.        *Reversed and remanded.*

CHIEF JUSTICE STEELE and Mr. JUSTICE MUSSER concur.