**UTEX EXPLORATION COMPANY, Appellant,**

v.

**Archie GARWOOD, R. C. Gerlach and W. E. Bozman, Appellees.**

**No. 5541.**

United States Court of Appeals Tenth Circuit.

July 8, 1957.

C. E. Henderson, Salt Lake City, Utah (Henry Ruggeri, Price, Utah, Mitchell Melich, Moab, Utah, Clair M. Senior and H. R. Waldo, Salt Lake City, Utah, on the brief), for appellant.

Harley W. Gustin, Salt Lake City, Utah (George E. Dilts and Julian P. Hancock, Cortez, Colo., on the brief), for appellees.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

In this suit by mining lessees against their lessor for wrongful eviction, the trial court found for the lessees, and entered judgment based upon the "in place" value of the ore remaining on the leased premises at the time of the eviction.

Actionable eviction turns on the interpretation of a two-year mining lease contract, beginning February, 1953, covering a portion of an unpatented mining claim in San Juan County, Utah. In addition to the usual covenants for diligent and workmanlike operations, the contract specifically obligated the lessees to immediately commence the driving of an incline or drift level from a point in the wash to the intersection of the adjacent ore body of the claim then being mined by the lessor, thence through the ore body until connection was made with a ventilation shaft on the lessor's premises. The incline was to be used for ventilation purposes and as a haulageway for ore mined by both the lessor and lessees, the lessor being specifically given the right to use the incline to move its ore from the adjoining property without cost; provided such use would not interfere in any way with the mining operations of the lessees.

The lease contemplated that in the course of the mining operations, the

lessees would carve out supporting pillars in the earth and ore body; and it was stipulated that before removing any such pillars from the leased premises, the lessees would give to the lessor "the right to purchase in place all ore contained in said pillar or pillars at a rate based on the average value of the ore theretofore removed from the said leased premises, less the royalty to the lessor from said ore." Upon the exercise of such option to purchase the pillars aforesaid, they were to become and remain the property of the lessor, provided, however, that if the lessor failed to exercise its option to purchase within thirty days after the offer, the lessees had the right to remove the pillars and the ore contained therein.

The lease further provided that upon the failure of the lessees to keep or perform any of the covenants therein, it would, at the option of the lessor, expire and the demised property forfeited to the lessor with the right of immediate possession upon demand; provided further that before any forfeiture should be declared or enforced, the lessor must notify the lessees in writing of an alleged breach, setting forth in the notice a detailed description of the same. Whereupon, the lessees had sixty days after the receipt of such notice within which to correct or rectify the breach.

Immediately after the execution of the lease contract, the lessees drove the incline in accordance with the contract, and the same was used for ventilation and a haulageway by the lessor and lessees during the mining operations on the leased premises and the adjoining property of the lessor. When in the course of the mining operations on the leased premises, most of the ore body had been removed, leaving only supporting ore pillars, the lessor, early in July, inquired of the lessees concerning their plans for the "removal of the ore pillars from the leased premises", showing "how you intend to remove these pillars so we can give the same our careful study and submission to the Industrial Commission of Utah, who will have to approve the manner in which the pillars can be removed."

After conferences and negotiations, and about the first of August, the lessees informed the lessor in writing of their plan to install concrete footings and I beams in lieu of the ore pillars. In the same letter, the lessees requested a letter from the lessor relinquishing its right to purchase the pillars and an extension of the lease to and including April 30, 1955 in which to remove them. After further conference, the lessees' letter to the lessor was amended to delete the request for an extension.

When, on August 23, the parties met in conference, the lessor delivered to the lessees a map on which all of the ore pillars on the leased premises were marked in red or green. The green pillars (with exception of pillar 19) were all along the passageway and the haulageway; the red pillars were in strategic parts of the mined premises. The lessees were informed at that time that they could remove the red pillars but that they could not remove the green ones; that there was "an honest difference of opinion" between the lessor and lessees "on what constitutes pillars and what does not constitute pillars"; that the lessor would "buy all of the ore that the court interprets belongs to you", but that it would "not pay you for any ore until a court" so orders.

It was thus the position of the lessor, then as now, that the lease contract contemplated the preservation of the haulageway for the use and benefit of the lessor in its mining operations; and that the removal of the pillars alongside the haulageway would collapse it and render it useless, both as a haulageway and for ventilation purposes. The lessees' immediate response to this ultimatum is not clear, but in any event they proceeded to remove the red pillars in the regular course of the mining operations and in accordance with accepted mining practices. When most of the red pillars had been removed, and on October 21, 1954, the lessees extended to the lessor in writing the right to purchase in place all of the remaining pillars along the haulageway. In the same writing, the lessor was

informed that in the event of the rejection of the offers to purchase or the failure to advise in writing before the expiration of the thirty-day period, lessees would then commence operations to remove the ore in all of the pillars along the haulageway and passageway.

On the following November 15, and within the thirty-day period, the lessor declared a breach of the contract for failure of the lessees to pay the royalty in accordance with the lease contract and for failure to carry on the mining operations in a workmanlike manner; and particularly because the proposed removal of the pillars would destroy the haulageway and the ventilation system of the lessor's adjoining property in violation of good mining practice and of the lease contract. When, on November 18, the lessees' workmen commenced the removal of green pillar 19, a short distance from the haulageway, the lessor forcibly evicted the lessees and this suit followed.

It seems to be agreed that the removal of the green pillars would collapse the haulageway, rendering it useless both as a means of removing ore and as ventilation for the adjoining mine. And, in support of its construction of the contract to require the preservation of the haulageway by leaving the supporting ore pillars, the lessor invokes the conduct of the parties. Pointing to the conference on August 23, when an officer of the lessor stated that there was an "honest difference of opinion" concerning "what constitutes pillars and what does not", lessor says in effect that when the lessees accepted the map with the red and green pillars marked thereon and proceeded to mine the red pillars, leaving the green intact, they thereupon accepted lessor's construction of the contract. They say with emphasis that the lessor thus offered to relinquish its thirty-day option to purchase the red pillars provided lessees leave the green; that the lessees accepted the offer by removing all of the red without offering the same to the lessor pursuant to the terms of the lease; that this constitutes the only requisite consideration for the lessor's relinquishment of its option to purchase the red pillars with the resulting obligation on the part of the lessees to leave the green pillars.

The trial court interpreted the lease as giving the lessees the right to enter and remove all of the ore on the lease, subject only to the right of the lessees to elect to purchase the ore pillars in place. It could find no contractual difference between the pillars along the haulageway and the other ore pillars; and it was of the view that if the lessor desired to preserve the haulageway for its own mining operations, it could do so by electing to purchase the ore pillars which supported it; that "His [lessor] election to buy was all the protection he felt he needed and all the protection he sought and all the protection there is in that lease against the destruction of the haulageway by the end of the lease term." The trial court thus declined to construe the August 23 conference as an offer on the part of the lessor to relinquish its right to purchase the red pillars, conditioned on leaving the green ones, the acceptance or assent to which was manifested by the lessees' subsequent conduct in the continued performance of the contract. Instead, it construed the statement made at the conference to be a part of a plan deliberately calculated to take the pillars marked green without payment therefor, contrary to the terms of the lease, and not made in good faith or acquiesced in by the lessees. The court was of the view that the conduct and statements of the lessor on August 23 and November 15, 16, 18 and 19, constituted successive anticipatory breaches of the lease agreement and upon eviction of the lessees, the lessor became obligated to pay lessees for the remaining ore on the lease as if it had elected to purchase such ore under the terms of the lease contract.

■ It is of course axiomatic that a contract shall be interpreted as a harmonious whole to effectuate the intention of the parties. Every word, phrase or part of a contract should be given a meaning and significance according to

its importance in the context of the contract. Basler v. Warren, 10 Cir., 159 F.2d 41; Phillips Petroleum Co. v. McCormick, 10 Cir., 211 F.2d 361. And, the interpretative intendment of the parties to a contract is often best evidenced by their conduct in the execution of it. See Hardinge Co. v. Eimco Corp., 1 Utah 2d 320, 266 P.2d 494, citing 3 Williston on Contracts § 623. See also Ogden Electric Co. v. Engineers, 10 Cir., 151 F.2d 657; Restatement Contracts § 235(e).

■ Undoubtedly the lease contract contemplated that in the course of the mining operations, supporting ore pillars would be carved out of the ore body. And, it also seems plain enough that the lessees had the right to mine such ore pillars unless the lessor elected to purchase them. As a representative of the lessor stated at the August 23 conference, the difference of opinion arose over what constituted ore pillars. And, the answer to that question depends of course on whether the parties contemplated the preservation of the haulageway after the expiration of the lease. The contract did not expressly provide for the preservation of the haulageway beyond the terms of the lease by leaving supporting pillars. Any such covenant must be implied from the manifest intention of the parties to mine the ore diligently in accordance with accepted mining practices. The contract provided for the driving of the incline or haulageway for the use and benefit of both parties with free use to the lessor so long as it would not interfere with the mining operations of the lessees. While such qualified right of use may not be said to positively negate the right to continued use after the expiration of the lease, it is, we think, susceptible of an inference not to obligate the lessees to preserve it for the use of the lessor after the expiration of the lease contract. This permissible inference is strengthened, we think, by the option of the lessor to purchase all ore pillars, in the absence of the exercise of which, the lessees were given the right to mine all of the ore. Then, it is of some significance that while the lease was being mined, the lessor drove a shaft or incline known as Rosalie Number 2 outside the lease property to connect with its own adjoining property. This incline was capable of being used both as a haulageway for the lessor's mining operations and for ventilation purposes quite apart from the haulageway in controversy. In the last analysis, the question of interpretation comes down to whether we will apply an "obligation where it is noticeably silent". We have recently said that we can only imply an obligation with respect to which the contract is silent when a consideration of the whole of its parts admits of no other reasonable construction. See United States v. Nickel, 10 Cir., 243 F.2d 924. Construing the whole contract and every word and phrase therein in its proper context, we cannot say that the trial court's interpretation of it is clearly erroneous and we accept it.

The lessor says, however, that the lessees breached the contract when they commenced mining green pillar 19 on November 18, before the expiration of lessor's thirty-day option to purchase on November 20, and that they thereby violated the contract, justifying forfeiture and eviction; or in any event, precluding a right of recovery. The trial court excused full performance of this condition precedent on the basis of an anticipatory breach by lessor on August 23, and again on November 15.

In the first place, the lessees say that the doctrine of anticipatory breach being confined to contracts containing mutually executory provisions, see Brimmer v. Union Oil Co. of California, 10 Cir., 81 F.2d 437, 105 A.L.R. 454; Restatement on Contracts, § 318, it is inapplicable here to a unilateral lease contract. See Cerruti v. Burdick, 130 Conn. 284, 33 A.2d 333; People ex rel. Nelson v. West Town State Bank, 373 Ill. 106, 25 N.E.2d 509.

■ But, we think the contract clearly bilateral with dependency of performance at the time of the repudia-

tion. Certainly the lessees had not performed all of their obligations under the contract on August 23, or for that matter on November 15. The lease contract was executory quite as much as the lease contract in Bu-Vi-Bar Petroleum Corp. v. Krow, 40 F.2d 488, 491, 69 A.L.R. 1295, wherein this court sustained the anticipatory breach, stating that, "When one party to a contract gives notice to the other party, before the latter is in default, that he will not perform such contract on his part and does not retract such notice before performance on his part is due, such other party is entitled to enforce the contract without previously performing or offering to perform the provisions of the contract upon his part in favor of the former party." See also § 306, Restatement on Contracts. And, we went on to hold, following Williston (Vol. 5, Rev.Ed. § 1337) that in the event of an anticipatory breach, the injured party has the right "(1) to rescind the contract altogether, and if any performance has already been rendered by the injured party, to recover its value on principles of quasi-contract; (2) to elect to treat the repudiation as a breach, either by bringing suit promptly, or by making some change of position, or (3) to await the time for performance of the contract and bring suit after that time has arrived."

Being satisfied of the anticipatory breach on August 23, the trial court did not think that the continued performance of the contract by the lessees, and the giving of the thirty-day notice as provided in the contract, amounted to more than a manifestation of a purpose to allow the lessor to repent after repudiation. Lagerloef Trading Co. v. American Paper Products, 7 Cir., 291 F. 947. Indeed, the trial court thought that the lessees' conduct fell precisely within Section 320, Restatement on Contracts, to the effect that "Manifestation by the injured party of a purpose to allow or to require performance by the promisor in spite of repudiation by him, does not nullify its effect as a breach, or prevent it from excusing performance of con-ditions and from discharging the duty to render a return performance."

We agree with the trial court that when, on August 23, lessor informed the lessees that they could not mine the green pillars, they thereby repudiated the contract as we have construed it. True, the repudiation was based upon an honest difference of opinion concerning a construction of the contract, but the lessor stood upon its interpretation of it, saying that it would purchase the ore in the green pillars only when the court ordered it to do so. We also agree with the trial court that the mining of the red pillars was not prejudicial to the right of the lessees to mine the green pillars when they reached them in the regular course of mining operations. Nor can any adverse inference be drawn from the thirty-day written notice as provided under the contract. It was in consonance with the contract; it afforded the lessor an opportunity to withdraw its repudiation; and it did not in any way enhance the damages flowing from the anticipated breach. When, on November 15, the lessor declared a positive breach of the contract on the part of the lessees, it thereupon positively repudiated the contract by refusal to purchase or permit the lessees to proceed under the contract. We think the facts fall clearly within the American doctrine of anticipatory breach. See 5 Williston, § 1337. There is no serious contention concerning the lessees' failure to pay the royalty or the breach of any other obligation of the contract. We conclude therefore that the lessees are entitled to prevail, and the only remaining question is the measure of recovery.

The parties agree on the gross amount of ore remaining in the pillars at the time of eviction and upon the gross amount they would have been paid for same if all of such ore had been mined, delivered and sold at the Purchasing Station of the Atomic Energy Commission. But the parties do not agree on, and there is no proof of, the net amount of ore which could have been mined and delivered to the Atomic Energy Com-

mission or the net worth or value thereof. Indeed, the trial court's judgment being based upon the "in place" value of the ore as if it had been purchased by the lessor under the election provisions of the contract, took no account of the mining cost in arriving at the amount of recovery in its judgment. In so doing, it construed the critical words "at a price based on the average value of the ore theretofore removed from the premises" as an agreement to purchase the ore in place at the delivered price. Invoking the prospective profits rule, generally applicable in cases of this kind, see Smuggler-Union Mining Co. v. Kent, 47 Colo. 320, 112 P. 223; Rude v. MacCormac, 72 Colo. 221, 210 P. 844; Butterfield v. Snively, 60 Ohio App. 14, 19 N.E.2d 284; Paul v. Cragnaz, 25 Nev. 293, 60 P. 983, 47 L.R.A. 540; Boyle v. Bay, 81 Colo. 125, 254 P. 156, the lessor earnestly contends that the judgment of the court is unsupported by any facts and ought to be reversed.

We think the trial court correctly treated the breach of the contract as an election to purchase the ore under Paragraph 8 of the lease; that the contract therefore by its terms spells out the measure of recovery; and that the usual rule of prospective profits is inapplicable, unless the contract by its terms makes it so. We will not penalize the lessor unless by its own contract it has done so. Having purchased the ore in place, and the amount thereof having been agreed upon, its recoverability was irrelevant. Moreover, it was certainly not the burden of the lessees to show that the amount of ore sold in place could have been mined and delivered.

But, the agreed purchase price, based upon the "average value of the ore heretofore removed from the premises" does not necessarily mean the price delivered to the Atomic Energy Commission. The words "based upon" have been construed as an "initial or starting point for calculation." See State ex rel. Snidow v. Board of Equalization, 93 Mont. 19, 17 P.2d 68, 18 P.2d 804. The trial court thought that the lessees were entitled to damages which would place them as nearly in the same position as they would have been had the lessor performed its contract, and we agree.

Making application of this formula, if the lessor had not elected to purchase the ore, the lessees would have realized only the net value of the pillar ore based upon the delivered price at the Atomic Energy Commission. It does not seem reasonable or logical to say that the lease contract was intended to allow the lessees to recover any more for the ore if it was purchased in place than they would have realized if they had mined it. We think that the true interpretation of the contract contemplated the recovery of the net value of the ore.

The case is reversed and remanded with directions to proceed accordingly.