**ATLANTIC AMERICAN LIFE INSUR-
ANCE COMPANY, Plaintiff,**

v.

**PEOPLES LIFE INSURANCE COMPA-
NY OF SOUTH CAROLINA and Peo-
ples Fire Insurance Company, Defend-
ants.**

**Civ. A. No. AC–1675.**

United States District Court
D. South Carolina,
Columbia Division.

May 12, 1967.

W. Ray Berry, Fulmer, Barnes, Berry
& Austin, Columbia, S.C., for plaintiff.

Edward W. Mullins, Jr., Nelson, Mul-
lins, Grier & Scarborough, Lowell W.
Ross, Rogers, McDonald & Ross, Colum-
bia, S.C., for defendants.

DONALD RUSSELL, District Judge.

This is an action to determine the
rights and liabilities of the parties under
two contracts executed between them.
Because of the complexities involved, an
accounting, it is conceded, will be neces-
sary; but, before such accounting can be
had, certain terms and provisions of the
contracts must be construed.

The matter was brought before me for
the purpose of securing such construc-
tion. It was heard without a jury. On
the basis of the pleadings, stipulations of
the parties, and testimony taken, I make
the following findings of fact in con-
nection with the construction of the con-
tracts herein:

### FINDINGS OF FACT

1. The parties to the two contracts in
question are Empire Life Insurance Com-
pany, Empire Insurance Company, Sure-
way Life Insurance Company of South
Carolina, hereinafter referred to as

"Empire Group", on the one hand, and Peoples Life Insurance Company of Cheraw and Peoples Fire Insurance Company of Cheraw, hereinafter referred to as "Peoples Group". Subsequent to the execution of the contracts, Empire merged with the plaintiff, which, by the terms of the merger, acquired all the rights and assumed all the liabilities of the Empire Group in and under the two contracts. Since the plaintiff stands in the shoes of Empire, references hereinafter to "Empire Group" embrace the plaintiff.

2. Both groups are engaged in the issuance of credit life insurance. Such insurance is a form of term insurance, "issued to a creditor to cover the lives of his debtors in the amount of their outstanding loans and payable to the creditor should they die before loans are repaid."[1] In the case of both groups, the creditors with whom they dealt and to whom they issued insurance were personal loan companies, which were described by the parties as accounts. Such loan companies acted both as agents and as beneficiaries in the issuance of such policies and were credited with a commission of fifty-five percent (55%) of all premiums charged. They made refunds for prepaid loans and paid losses as they accrued. They reported monthly premiums collected, refunds made and losses paid for such period. With such report, they included, also, payment for premiums on all business written during the monthly period, less agents' commissions, refunds made and losses paid. An account is described as "active" when it places its insurance through the Group; when it transfers its insurance to another insurance group, the account becomes "inactive".

3. So long as the account continues to write its insurance through the group, or, as the parties put it, remains "active", the premium income normally equals or exceeds the losses and refunds.

When it becomes inactive, the account from that point is a liability, since the insurance company must continue to pay claims for refunds and losses on outstanding insurance but collects no compensating premiums on any new business.

4. In April, 1962, the Peoples Group experienced a large number of transfers in its active accounts. Such accounts dropped from 85 in April to 21 on the date of the execution of the contracts herein. The 64 accounts which thus became inactive became, as has been indicated, liabilities to the Peoples Group. This created financial embarrassment for Peoples Group. In order to relieve this situation, these contracts, involving reinsurance of the business of the Peoples Group by the Empire Group were executed. It is, in connection with such contracts, that this controversy has arisen.

5. So far as pertinent herein, the first of the contracts involved, described as "Reinsurance Agreement" and hereinafter referred to as contract "A", provided as follows:

"1. Empire Group does hereby reinsure and Peoples Group does hereby cede in reinsurance its entire portfolio of the business popularly known and designated as credit life, credit accident and health, credit automobile and credit fire insurance.

"2. As payment for such reinsurance, Peoples Group shall transfer and pay over unto Empire Group the entire unearned premium reserve referably to such insurance. Empire Group shall assume each and every obligation and liability of Peoples' Group with respect to the business ceded and shall be responsible for disposition of claims and losses whether by way of adjustment, settlement, compromise or defense all with the sole discretion and judgment of Empire Group. Provided, however, and not withstanding other sections hereof; in the event that any account of Peoples Group hereafter terminates or has terminated its account with Peoples Group or ceases to continue business with People's Group, then, with respect to each and every such ac-

1. Gregg, Group Life Insurance, rev. ed., p. 101. See, also Report of Special Committee created under Resolution No. H-27249, S.C.Gen.Assembly, 1964.

count, People's Group may assume responsibility and shall have sole discretion and judgment of remedy for the underwriting results and shall fully indemnify and save harmless Empire Group of and from loss with respect to each and every such account."

6. The second agreement between the parties, hereinafter described as contract "C", so far as pertinent, provided as follows:

"It is understood and specifically agreed that this Agreement and a certain Agreement of Reinsurance executed contemporaneously herewith and made a part hereof are interdependent and that breach of performance of one group shall at the option of the other group, immediately and by that fact terminate and cancel the other except with respect to any provision to the effect that one group shall indemnify and save harmless the other from loss.

"1. Empire Group agrees to credit and pay Peoples Group on or before the 20th day of each month an amount computed in accordance with the following:

"(a) Twenty (20%) per cent of the remainder of net premiums (i. e. gross premiums less refunds and return premiums) after deducting allowable agent's commissions and reasonable and customary losses and claims.

"Provided, however, that during the existence of any deficit incident to the handling of the run-off of business under the "inactive accounts" the credit herein referred to shall first be applied to the eradication of such deficit.

"Further provided, that if, on July 1, 1963, such remainder constitutes a deficit, Peoples Group shall fully indemnify Empire Group and pay over unto Empire Group the amount of such deficit.

"2. The payment for reinsurance by Peoples Group to Empire Group as outlined in Section Two of reinsurance agreement attached hereto and/or made a part hereof, shall be limited to the assigning and/or forwarding to Empire Group the following:

"(a) One hundred (100%) per cent of the net premiums received by Peoples Group on the type business reinsured herein on and after July 1, 1962, after deducting an allowable agents commission. Reserve deficit, if any, regarding unearned premium reserves, shall be the sole responsibility and liability of Empire Group."

7. Contract "C" is dated September 21, 1962, almost three months later than the date of contract "A". However, contract "C" replaced an earlier contract which was executed contemporaneously with contract "A". Other than for two paragraphs providing for reciprocal loans between the parties, contract "C" and the contract executed contemporaneously with "A" were identical. The provisions in the earlier contract for reciprocal loans were objected to by the Insurance Commissioner and were omitted for that reason. Because of this, the contract was rewritten as contract "C", incorporating exactly the same wording as the earlier contract, save for the provisions dealing with reciprocal loans. Contract "C", which was intended to replace the earlier contract, was to be construed as executed contemporaneously with "A" and the parties expressly so stated in contract "C".

8. At first, it was understood by both parties that section 2 of contract "A" was of force; and statements of accounts, based on such assumption, were prepared by Empire and submitted to Peoples.

## STATEMENT OF THE ISSUES

By agreement of the parties, the questions relative to the construction of the two contracts, submitted for the decision of the Court, are:

(1) Is paragraph 2 of contract "A", under which Peoples Group was obligated to pay over "the entire unearned pre-

mium reserve" to the Empire Group, modified or supplanted by the provisions of contract "C" so that it applies only to the "unearned premium reserve" on inactive accounts as of (or subsequent to) the date of the contract?

(2) How is the term "deficit", used in the first proviso of section 1 of contract "C" to be defined and how is such "deficit" to be calculated?

## I.

▮ Turning to the first question, it is clear that the two contracts involved in this controversy (contracts "A" and "C"), by their express terms "executed contemporaneously" and intended as parts of a single agreement, should be read and construed together as one instrument. Bailey v. Railroad Company (1872), 84 U.S. 96, 17 Wall. 96, 106, 21 L.Ed. 611; Stewart v. Morris (1909), 84 S.C. 148, 153, 65 S.E. 1044.

So constructed, the contracts are to be interpreted as "a harmonious whole" and "effect" shall be "given if practicable, to every clause and word in it (them)." Three States Coal Co. v. Mollohon Mfg. Co. (1926), 137 S.C. 345, 350, 135 S.E. 380, 382; Bruce v. Blalock (1962), 241 S.C. 155, 161, 127 S.E.2d 439; 63 A.L.R. 2d 1337; Utex Exploration Company v. Garwood (C.C.A.Utah 1957), 246 F.2d 547, 550–551; Phillips Petroleum Co. v. McCormick (C.C.A.N.M.1954), 211 F.2d 361, 364. In other words, each provision in the instruments is to be construed " ' "so as to be consistent with every other provision if possible, and that construction adopted which gives effect to every part of the contract." ' " Frankfort Oil Company v. Snakard (C.C.A. Okla.1960), 279 F.2d 436, 441, cert. denied 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259; 39 A.L.R.2d 840; Law v. Reading Company (C.C.A.Pa.1963), 312 F.2d 841, 845.

Applying these rules of construction, can the provisions of the two contracts, as they set forth the terms of payment by the Peoples Group to the Empire Group be "harmonized"? Under contract "A", Peoples ceded in reinsurance "its entire portfolio" of credit insurance and, "as payment for such reinsurance" it agreed to "pay over unto Empire Group the entire unearned premium reserve referable to such insurance." Contract "C", on the other hand, after providing for the payments monthly by Empire to Peoples of a fixed percentage of "the remainder of the net premiums", stated that "the payment for reinsurance by Peoples Group to Empire Group as outlined in Section Two of reinsurance agreement attached hereto and/or made a part hereof, shall be limited to * * * One Hundred (100%) per cent of the net premiums received by Peoples Group on the type business reinsured herein on and after July 1, 1962, after deducting an allowable agents' commissions".

Since both contracts were "executed contemporaneously" and were intended to represent a single, unified undertaking, it must be assumed that the provisions for payment in both contracts had meaning. Certainly, in drafting the two instruments with separate provisions for payment, the parties did not intend that such provisions should contradict and nullify one another. It would be reasonable to assume, on the contrary, that the two provisions were intended to apply to different and patently differentiated groups of insurance. Such a construction accords with that rule of construction, already stated, that the various provisions of a contract are to be reconciled and "harmonized" "so as to be consistent" with one another.

While the provisions of the contracts are not artfully or precisely expressed, the provisions for payment in the two contracts are, in my opinion, susceptible of a consistent interpretation and application: They deal with different groups of insurance. They were not intended to contradict and do not contradict one another. They were inserted to cover the full scope and purpose of the agreement which was intended to embrace both outstanding and future insurance to be re-

insured under the contracts. The provision for payment included in contract "A" dealt with and was intended to embrace outstanding insurance contracts of Peoples as of the date thereof; the similar provision in contract "C" covered future insurance, to be issued through accounts of Peoples on and after July 1, 1962. In short, "A" dealt with present and existing insurance contracts; "C" embraced future and anticipated insurance contracts.

This construction is fortified by an analysis of the various terms of the two contracts. Contract "A" was silent on the collection of premiums; contract "C" dealt almost exclusively with the collection and disposition of premiums. The reason was obvious. On the insurance covered by contract "A" the premiums had long since been collected by Peoples. Contract "C" provided for the proper distribution of premiums because it referred to new business on which premiums would be collected. A similar difference in treatment covered "unearned premium reserve." There was an "unearned premium reserve" in contract "A" because it embraced existing contracts on which an "unearned premium reserve" had arisen. There was under contract "C" no present "unearned premium reserve", which would only be created as new business was written and new premiums collected. Again, since, under the insurance business involved in contract "A", Peoples had collected the premium, it was liable, as section 2 of contract "A" provided, for the unearned reserve on such insurance; under contract "C", however, Empire received the major part of the premium and had, under paragraph 2(a) of such contract, "the sole responsibility and liability" for the "unearned premium reserves" to be set up for the account of such insurance. It is thus clear that the provisions for "payment" in the two contracts were intended to apply to two separate groups of insurance, with respect to which the rights and liabilities of the parties were different.

It is the contention of Peoples, however, that, though the two contracts were "executed contemporaneously" and were intended as "interdependent" parts of a single instrument, contract "C" should be construed, not as supplementing but as "supplanting" and superseding the provision of contract "A" which required the defendant to pay over "the entire unearned premium reserve referable to such insurance". It argues that the method of payment set forth in contract "C" should be applied to all insurance reinsured, including both that existing at the time of the execution of the contract and all future insurance issued. This, Peoples concedes, was not its original interpretation of its obligation under contract "A". In the agreed stipulation herein, "Peoples admits (admitted) that it originally agreed to pay over to Empire the unearned premium reserve (Paragraph 2, Exhibit 'A') but contends this was modified by Paragraph 2 of Exhibit 'C'." In its brief filed herein, Peoples puts it that, "Mr. Rogers (who was the responsible officer of Peoples in all matters involved herein) likewise testified that originally he had agreed to pay over the unearned premium reserve (thereby giving full effect to the provision for payment under contract 'A') but that the agreement as to this obligation was supplanted by the agreement to pay over One Hundred (100%) per cent of the net premiums received after July 1, 1962."

Such argument disregards the fact that contract "C" begins with the unqualified affirmation that, "It is understood and specifically agreed that this Agreement and certain Agreement of reinsurance executed contemporaneously herewith and made a part hereof are interdependent." Contract "C" was not intended to "supplant" or "modify" contract "A". The two contracts were to stand together. One was not to be subordinated to the other. Each was applicable and controlling in the situation to which it related. So much Mr. Rogers seems at first to have recognized. In my judgment, Mr. Rogers' original construction of his obligations

under the contract was sound. And this original interpretation of the contract by Mr. Rogers, which accords with that of the plaintiff, is declared generally to be of "great, if not controlling, influence" in the construction of the contracts. Stackhouse v. Pure Oil Co. et al. (1935), 176 S.C. 318, 337, 180 S.E. 188; Kitchens v. Lee (1952), 221 S.C. 59, 66, 69 S.E.2d 67; Utex Exploration Company v. Garwood, supra (246 F.2d p. 550). Especially is this true in this case, where only through such construction, can the terms of the two "interdependent" contracts be reconciled.

One remaining circumstance should be noted. Contract "C", although declaring itself "executed contemporaneously" with contract "A", was actually executed some three months afterwards. Contract "C", however, replaced another contract, which was actually "executed contemporaneously" with contract "A". In this earlier contract, among other things, reciprocal loans were to be made between the parties. Such provisions were objected to by the Insurance Commissioner. The earlier contract, at the instance of the Commissioner, was thereupon redrafted, omitting the paragraphs providing for reciprocal loans, but—and this is the important fact—making no changes whatsoever in any other particulars. Paragraphs 1 and 2 of contract "C" were exactly the same as in the earlier contract. They were "interdependent" parts of the contemporaneous agreement of the parties, as expressed originally by the parties. This conclusion necessarily follows from the expressed intention of the parties as set forth in contract "C" itself, already quoted above. Contract "C" was thus not intended to "supplant" in any particular contract "A". To the contrary, both were "interdependent" parts of a single contract.

■ It is accordingly the opinion of the Court that section 2 of contract "A" was not modified or supplanted by the terms of contract "C" and that Peoples Group was obligated by the terms of such section to pay over to Empire "the entire unearned premium reserve" on all outstanding insurance of Peoples, in both active and inactive accounts, as of date of contract.

## II.

■ The second provision of the contract, submitted for construction, is simpler. In my opinion, "deficit incident to the run-off of business under the 'inactive accounts' ", as used in the first proviso of section 1 of contract "C", should be defined as the balance, after crediting the unearned premium reserve of such account, as of date it became inactive, against losses and refunds chargeable to such account, on and after it became inactive. This construction is consistent with that adopted in connection with the accounts covered by contract "A". It, also, gives effect to that provision of section 2 of contract "C", which imposes on Empire Group "the sole responsibility and liability" for providing the earned premium reserve on all active accounts taken over on July 1, 1962, by the Empire Group.

## III.

It appeared on hearing that the Empire Group had received the premiums collected on all active accounts for the month of June, 1962. Such premiums should have accrued to the Peoples Group. They should, under such circumstances, be credited against the amount due Empire Group by the Peoples Group under section 2 of contract "A".

Since other questions may arise as the accounting herein proceeds, the Court reserves jurisdiction over this cause and will delay entry of any final order until final accounting is had.